**Allen Spock HARTMAN, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 04–94–00180–CR.**

Court of Appeals of Texas,
San Antonio.

Aug. 4, 1999.

George Scharmen, San Antonio, for appellant.

Angela Moore, Asst. Criminal Dist. Atty., San Antonio, for appellee.

Sitting: PHIL HARDBERGER, Chief Justice, TOM RICKHOFF, Justice, ALMA L. LÓPEZ, Justice, CATHERINE STONE, Justice, PAUL W. GREEN, Justice, SARAH B. DUNCAN, Justice, KAREN ANGELINI, Justice.

**OPINION**

Opinion by: TOM RICKHOFF, Justice.

Does a trial court abuse its discretion by admitting an expert's testimony, relating the results of a blood-alcohol test back

from the time it was taken to the time a defendant was driving, when the expert acknowledges he does not know the defendant's weight or his eating or drinking history on the occasion in question? We answer in the negative.

Allen Spock Hartman was convicted by a jury of being intoxicated while driving or operating a motor vehicle in a public place. *See* TEX. PEN.CODE ANN. § 49.04 (Vernon 1994). Punishment was assessed at ninety days in jail, probated for two years, and a fine of $300 plus court costs. On original submission, we held that reverse extrapolation testimony offered by the state to relate Hartman's breath test result to the point in time when he was driving was not subject to the analysis announced in *Kelly v. State,* 824 S.W.2d 568 (Tex.Crim.App. 1992). *Hartman v. State,* 917 S.W.2d 115, 120 (Tex.App.—San Antonio 1996). The Court of Criminal Appeals reversed and remanded to this court for analysis of this testimony under *Kelly. Hartman v. State,* 946 S.W.2d 60, 63 (Tex.Crim.App.1997). We find that the proffered testimony is sufficiently relevant and reliable that the trial court did not abuse its discretion in admitting it. We therefore affirm the judgment of the trial court.

### FACTS AND PROCEDURAL HISTORY

Officer John Muzny testified he was patrolling in north San Antonio on the night of July 8, 1992 when he noticed a VW Rabbit in front of him. The car had no taillights and was weaving within its lane. As Officer Muzny moved closer, he noticed that there were also no head lights shining on the pavement in front of the car. He turned on his emergency lights and pulled the car over. The driver, whom Officer Muzny later identified as Hartman, got out of the car and walked over towards him. Officer Muzny testified that Hartman's eyes were bloodshot and glassy, and his breath smelled strongly of alcohol. Officer Muzny explained to Hartman why he was being pulled over. Hartman explained that he had only had the car a little while,

and he was not used to it; that was why he was weaving in the roadway and why he did not have his lights on.

Officer Muzny then conducted field sobriety tests on Hartman. On the Horizontal Gaze Nystagmus test, a test used to detect for an involuntary jerking of the eye brought on by alcohol, Officer Muzny noticed that Hartman's eyes "had a very distinct jerk," and that Hartman started to giggle uncontrollably when the test was administered. Out of the six possible indicia of intoxication, Hartman demonstrated all six. Officer Muzny then asked Hartman to perform the Rhomberg test—that is, to stand with his heels together, hands at his side, tilt his head back slightly, and keep his eyes closed for thirty seconds. Officer Muzny instructed Hartman that, when he thought thirty seconds was over, he was to bring his head forward and open his eyes. Hartman lowered his head after four seconds. Officer Muzny then asked Hartman to perform the One Leg Stand Test, to test his balance and ability to judge time. Hartman put his foot down four times in thirty seconds. The last test Officer Muzny asked Hartman to perform was the Walk and Turn test. Hartman was unable to keep his balance during the instruction phase and frequently misstepped.

Hartman failed all four tests. Officer Muzny arrested Hartman for driving without a valid driver's license or effective liability insurance and took him to the station at 11:55 p.m. At 12:36 and 12:39 a.m., Hartman was given intoxilyzer tests by Officer Muzny. Both tests measured Hartman's blood alcohol content (BAC) at 0.138.

Prior to trial, Hartman filed a motion to suppress, inter alia, testimony regarding the breath test given by George McDougall, Bexar County's Breath Test Technical Supervisor. At the time of his testimony, McDougall was co-author of the Breath Test Operators Manual, which is used to train breath test operators throughout the state, and was an instructor for breath test

operators throughout South Texas. He had been certified by the Texas Department of Public Safety as an operator and technical supervisor for the Intoxilyzer 5000 breath test machine for more than 15 years.

At the motion to suppress hearing, McDougall testified that at the time of the test Hartman's blood alcohol concentration was 0.138. From this, McDougall extrapolated that his blood alcohol concentration was between 0.110 and 0.15 or 0.16 at the time of the stop. When asked whether he knew what Hartman had eaten prior to the stop, his age, his drinking history, or his weight, McDougall testified that he knew only Hartman's age. However, McDougall explained that he was able to testify regarding Hartman's blood alcohol concentration range at the time of the stop because of his training in studying the effects of alcohol upon a person's ability to safely drive a car; his study of how much alcohol it takes to reach a given alcohol concentration based on body weight; and his observations of over 2,000 students going through a complete drinking cycle at classes he taught at San Antonio College over the last seventeen years. McDougall also explained that the Intoxilyzer machine used for the breath test "already accounts for the subject's body weight...." In short, McDougall repeatedly testified that, although he could not testify to a precise blood alcohol concentration level at the time of the stop, he could testify to a blood alcohol concentration range.

On cross-examination, counsel for Hartman and McDougall agreed that the standard elimination rate of alcohol is .02 per cent per hour. McDougall also testified that, while it would take one to two minutes for alcohol to begin to register in the body if a person drank a shot of alcohol on an empty stomach, it might take ten to fifteen minutes if the person had just finished a meal of meat and potatoes. Accordingly, if Hartman had just finished a full meal at the time of the stop—forty minutes before registering 0.138 on the

Intoxilyzer—his blood alcohol concentration level at the time of the stop would most likely have been between 0.12 to 0.15. McDougall also testified, however, that it would not be remarkable for a person to maintain the same blood alcohol concentration level for forty minutes or longer, and that while a blood-alcohol concentration was more likely to "peak," or climb and fall rapidly, when drinking on an empty stomach, a person drinking on a full stomach would be more likely to "plateau," or maintain a more gradual blood-alcohol curve.

The trial judge denied Hartman's motion to suppress, and the case was tried to a jury. At trial, Officer Muzny and McDougall testified and were vigorously cross-examined by Hartman's counsel substantially as set forth above but in considerably more detail.

After the State rested, Hartman called his friend of twenty-eight years, Timothy J. McHugh. McHugh was the bartender who served Hartman the night of his arrest. According to McHugh, Hartman arrived about 8:30, had two gin and tonics in thirty to thirty-five minutes, and left for thirty to forty-five minutes. When Hartman returned, he ate dinner and had another drink and most of a fourth. Hartman was giving McHugh a ride home when he was stopped. McHugh testified that Hartman showed no signs of intoxication on that night; therefore, unlike on numerous previous occasions, McHugh did not ask Hartman to turn his keys over.

Hartman also testified. According to Hartman, he arrived shortly before 8:00 p.m., had one drink, which lasted through a visit to the parking lot to look at a car, had dinner, a second and third drink, and most of a fourth drink before leaving with McHugh. Hartman testified that Office Muzny said that he pulled him over because of an inoperable taillight, and he explained his poor performance on the field sobriety tests as a result of his feeling under pressure and various physical ailments. On rebuttal, McDougall testified that Hartman could not have demonstrat-

ed a 0.138 blood alcohol concentration forty minutes after his arrest if he had had just four gin and tonics between 8:00 and 11:00 p.m.; to show a 0.138 on the breath test, a person would have to have six drinks in his system at the time the specimen was produced. Given the standard elimination rate, McDougall testified, Hartman must have had a total intake of more than six drinks.

In the jury charge, "intoxication"was defined both as "[n]ot having the normal use of mental or physical faculties by reason of the introduction of alcohol into the body" and as "[h]aving an alcohol concentration of 0.10 or more." *See* TEX. PEN.CODE ANN. § 49.01 (Vernon 1994). The jury returned a verdict of guilty.

On appeal, Hartman questioned specifically the reliability of McDougall's testimony relating the result of the breath test back to the time when he was driving. This court declined to review McDougall's testimony under the *Kelly* test, on grounds that it was not "novel"; the court of criminal appeals reversed and remanded for our analysis.

ANALYSIS

■ Under *Kelly*, the proponent of scientific evidence has the burden of proving to the trial court, by clear and convincing evidence, that the proffered evidence is relevant and reliable. *Kelly*, 824 S.W.2d at 573. To be considered reliable, evidence based on a scientific theory must satisfy three criteria: 1) the underlying scientific theory must be valid; 2) the technique applying the theory must be valid; and 3) the technique must have been properly applied on the occasion in question. *Hartman*, 946 S.W.2d at 62. In our case, the first two prongs of the *Kelly* reliability test are not in issue. Rather, the question before us is whether McDougall's testimony was a proper application and use of Hartman's breath test result.

Hartman's attack on the reliability of McDougall's testimony is twofold. First, he notes that McDougall acknowledged not knowing how much the defendant weighed or his eating or drinking history that night. Second, Hartman contends that, because the two tests taken that night were so close together, they were essentially one test for the purpose of McDougall's testimony; that McDougall therefore did not know if Hartman's blood alcohol concentration was rising or falling; and that, absent this information, he could not have rendered a reliable opinion as to Hartman's blood alcohol concentration when driving. In light of all these infirmities, Hartman argues, the trial court abused its discretion in permitting McDougall's unreliable testimony as to Hartman's blood alcohol concentration at the time he was operating a motor vehicle in a public place.

We disagree with Hartman's characterization of McDougall's testimony. McDougall acknowledged that he did not have enough information to render a precise blood-alcohol concentration number for Hartman at the time he was driving. However, McDougall did say he could testify as to a range of blood-alcohol concentration; this range, he explained, would take into account such variables as whether Hartman had eaten and his body's unique way of metabolizing alcohol. McDougall acknowledged his calculations rendered a "ballpark" figure. Furthermore, Hartman's counsel vigorously cross-examined McDougall on his opinion and the information which he lacked in rendering his opinion.

■ The question in our case is not whether all experts would reach the same numerical result as McDougall; the question is whether his testimony was sufficiently relevant and reliable to aid the jury in its deliberations. Given McDougall's impeccable qualifications, including extensive personal observations of the alcohol absorption and elimination process, and the limits which McDougall placed on his opinion, we find the trial court did not abuse its discretion in admitting his testi-

mony. Once the trial court so found, any further doubts as to the veracity of McDougall's opinions were for the trier of fact to weigh in its deliberations. *See Forte v. State*, 707 S.W.2d 89, 94–95 (Tex. Crim.App.1986). Moreover, because the jury was charged under both definitions of intoxication, and given the arresting officer's testimony as to Hartman's apparent intoxication at the time he was stopped, we find Hartman did not show he was harmed by the admission of McDougall's testimony. *See Ochoa v. State*, 994 S.W.2d 283, 1999 WL 318844 (Tex.App.—El Paso May 20, 1999, no pet. h.).

We therefore AFFIRM the judgment of the trial court.

PAUL W. GREEN, KAREN ANGELINI, Justices, concurring.

Dissenting opinion by: SARAH B. DUNCAN, Justice.

I respectfully dissent.

## APPLICABLE LAW AND STANDARD OF REVIEW

To be admissible, expert scientific testimony must be " 'sufficiently *reliable* and *relevant* to help the jury in reaching accurate results.' " *Hartman v. State*, 946 S.W.2d 60, 62 (Tex.Crim.App.1997) (emphasis in original) (quoting *Kelly v. State*, 824 S.W.2d 568, 572 (Tex.Crim.App.1992)). "To be considered reliable, evidence based on a scientific theory must satisfy three criteria: (1) the underlying scientific theory must be valid; (2) the technique applying the theory must be valid; and (3) the technique must have been properly applied on the occasion in question." *Id.* The burden of persuasion on these issues rests with the proponent of the evidence, and the standard of proof is by clear and convincing evidence. *Kelly*, 824 S.W.2d at 573.

On appeal, we review the trial court's admission of expert scientific testimony under an abuse of discretion standard. *Waring v. Wommack*, 945 S.W.2d 889, 892 (Tex. App.—Austin 1997, no pet.). Under this standard, we view the evidence in the light most favorable to the trial court's ruling, affording almost total deference to findings of historical fact supported by the record. *Loserth v. State*, 963 S.W.2d 770, 772–74 (Tex. Crim. App. 1998); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). However, when the resolution of a factual issue does not turn upon an evaluation of credibility or demeanor, we review the trial court's determination of the applicable law, as well as its application of the appropriate law to the facts it has found, de novo. *Guzman*, 955 S.W.2d at 89.

## VALIDITY OF UNDERLYING SCIENTIFIC THEORY

"In alcohol-related matters, such as driving under the influence, the most common toxicological question is: Given a blood alcohol concentration (BAC) at a specific time, can the BAC at any earlier time be predicted reliably?" Mark J. Reasor & Mark R. Montgomery, *Driving Under the Influence: Is Retrograde Extrapolation of Blood Alcohol Scientifically Valid?*, 9 W. VA. LAW. 14, 14 (1996). The answer is "yes"—a process known as retrograde extrapolation can provide an answer if one knows certain information. *See id.* The trial court was thus entitled to conclude, as it must have, that the theory underlying McDougal's testimony—retrograde extrapolation—is a valid scientific theory, and this prong of the *Kelly* test was met.

## VALIDITY OF THE TECHNIQUE APPLYING THE THEORY

To apply the theory of retrograde extrapolation, one must either (1) know the type of alcohol consumed, the rate of consumption, and various other factors or (2) make assumptions regarding the relevant factors. *Id.; see also, e.g.*, Texas Department of Public Safety, TEXAS BREATH ALCOHOL TESTING PROGRAM OPERATOR MANUAL at 5–10 (TLE/br–38 (Rev.9/96)) ("Unless all

the variables [food, time, type of alcohol, rate, and time of last drink] are known, the exact ethanol concentration at the time of arrest cannot be accurately and precisely predicted. The alcohol concentration may be higher, lower, or the same.").

In the past, many assumed a person's alcohol concentration at the time he was stopped "was at least as high, and probably higher" than later, when an alcohol concentration test was administered. Richard F. Fitzgerald & David N. Hume, *The Single Chemical Test for Intoxication: A Challenge to Admissiblity*, 66 MASS. L.REV. 23, 28 (1981); *see* Jennifer L. Pariser, Note, *In Vino Veritas: The Truth About Blood Alcohol Presumptions in State Drunk Driving Law*, 64 N.Y.U. L.REV. 141, 149–50 (1989). However, today "[m]ost experts agree that it ordinarily takes forty-five to ninety minutes to attain a peak BAC level on an empty stomach, and two to three hours if alcohol is consumed with or after a meal, while a few contend that the time lag between alcohol consumption and absorption into the blood stream is even longer." *McLean v. Moran*, 963 F.2d 1306, 1309–10 (9th Cir.1992); *see, e.g.*, Kurt M. Dubowski, *Absorption, Distribution and Elimination of Alcohol: Highway Safety Aspects*, Supp. 10 J. STUD. ON ALCOHOL 98, 99 (1985). In short, it is invalid to assume a person's alcohol concentration either remains the same or increases over a forty minute period. Therefore, if one makes this invalid assumption, his technique of applying the theory of retrograde extrapolation is likewise invalid.

In this case, McDougal testified he did not know Hartman's weight, drinking history, or food intake. Instead, he based his technique of applying the theory of retrograde extrapolation on an assumption reliable scientific principles holds invalid, that is, Hartman's alcohol concentration either remained the same or increased between the time he was stopped and the time he submitted breath samples. As a result, McDougal's technique of applying the the-ory of retrograde extrapolation is itself invalid. Admitting McDougal's retrograde extrapolation testimony over Hartman's objection was thus error.

## HARM

The majority holds Hartman cannot show he was harmed by the erroneous admission of McDougal's testimony because the jury was charged under both definitions of intoxication. I disagree.

During the lengthy pendency of this appeal, the Texas Court of Criminal Appeals promulgated amended rules of procedure, including an amended rule on harmful error. *See* TEX.R.APP. P. 44.2. Under the rules in effect at the time Hartman appealed and when this court issued its original opinion, an error required reversal "unless the appellate court determine[d] beyond a reasonable doubt that the error made no contribution to the conviction or to the punishment." TEX.R.APP. P. 81(b)(2), 60 Tex. B.J. 408, 409 (Tex.Crim.App.1997, repealed 1997). However, under the rules now in effect a non-constitutional error "must be disregarded" unless it "affect[s] substantial rights." TEX.R.APP. P. 44.2(b). The amended rules apply "except to the extent that in the opinion of the court their application in a particular proceeding then pending would not be feasible or would work injustice, in which case the former procedure may be followed." *Court of Criminal Appeals Final Approval of Revisions to the Texas Rules of Appellate Procedure* para. 2 (Aug. 15, 1997).

The majority holds Hartman cannot show reversible error under Rule 44.2(b). However, the majority fails to consider whether its application of Rule 44.2(b) is unjust. I would hold it would be unjust to apply the less stringent standard for harmful error contained in Rule 44.2(b) merely because this court erred in failing to apply the *Kelly* test in its original opinion (which I authored). I would therefore reverse the trial court's judgment under the standard set forth in repealed Rule

81(b)(2) and remand this cause to the trial court for a new trial.