Raul MATA, Appellant,

v.

The STATE of Texas, Appellee.

No. 04–94–00099–CR.

Court of Appeals of Texas,
San Antonio.

Nov. 30, 1999.

George Scharmen, San Antonio, for Appellant.

Angela Moore, Asst. Crim. Dist. Atty., San Antonio, for Appellee.

Sitting: PHIL HARDBERGER, Chief Justice CATHERINE STONE, Justice CARLOS C. CADENA, Chief Justice (Retired).

PER CURIAM.

A jury found appellant, Raul Mata, guilty of driving while intoxicated. In six points of error, Mata challenges: (1) the trial court's failure to suppress the testimony of George McDougall regarding the range of Mata's intoxication because the

testimony was not scientifically reliable; (2) the trial court's denial of Mata's challenges for cause during voir dire; and (3) the trial court's denial of Mata's requested jury instruction and the overruling of Mata's objection to the charge. We affirm the trial court's judgment.

### McDougall's Testimony

■ Mata's first two points of error challenge the denial of his motion to suppress the testimony of George McDougall regarding the range of Mata's blood alcohol concentration (BAC) at the time he was driving. Specifically, Mata challenges the reliability of McDougall's testimony that related the result of Mata's breath test back to the time when he was driving.[1]

In *Hartman v. State*, this court, sitting *en banc*, rejected a similar challenge to the testimony of the same expert witness in another DWI case. 2 S.W.3d 490 (Tex. App.—San Antonio, 1999, pet. filed). We noted:

> Given McDougall's impeccable qualifications, including extensive personal observations of the alcohol absorption and elimination process, and the limits which McDougall placed on his opinion, we find the trial court did not abuse its discretion in admitting his testimony. Once the trial court so found, any further doubts as to the veracity of McDougall's opinions were for the trier of fact to weigh in its deliberations.

*Id.* We adopt the reasoning in *Hartman* and overrule Mata's first two points of error.[2]

### Challenges to Venire Members

By points 3 and 4, Mata argues that the trial court committed reversible error by overruling his challenges for cause to members of the venire, Hope Vega and

Charles Kimbrough. We overrule both points.

Mata asserts, and the State does not deny, that he used all of his peremptory challenges and, because the court denied his request for two additional strikes, he was forced to accept as members of the jury Hope Vega and Charles Kimbrough. Mata contends Vega was objectionable because she had relatives who were police officers and she indicated that she would give the benefit of the doubt to the State. Mata says Kimbrough was objectionable because he indicated that if a person "blew" a BAC of .10 or higher one hour after being arrested, he would automatically find that person guilty of DWI without requiring that the breath test result be related back to the time of the offense or the time of the arrest. It is, therefore, necessary that we determine whether the trial court erroneously overruled Mata's challenges for cause to Vega and Kimbrough.

#### A. *Hope Vega*

■ Mata argues that Vega's answers to questions indicated that if she had doubts concerning Mata's guilt or innocence she would resolve such doubt in favor of the State and find him guilty because several of her relatives were police officers. Vega's refusal to give Mata the benefit of any reasonable doubt would clearly be a refusal to follow the law and would be a ground for a challenge for cause. TEX. CODE CRIM. PROC. ANN. art. 35.16(c)(2) (Vernon 1989). Based on Vega's testimony, however, we cannot hold that the trial judge abused his discretion in overruling the challenge for cause. We believe that, considering her entire testimony on voir dire, the trial judge was justified in finding that such testimony did not reflect a set bias such as would disqualify her.

---

1. The dissenting opinion extensively details this testimony, so we do not repeat it here. We agree with the dissent's analysis that this issue was properly preserved for appellate review.

2. Although the dissenting opinion is well-researched and reasoned, we do not find it necessary to revisit the *Hartman* debate.

When questioned by Mata, Vega said she realized that the law presumes that a defendant is presumed to be innocent and that this means that he "gets the benefit of the doubt because the burden of proof is on the State." When asked if she still felt that she would give the State the benefit of the doubt, she answered, "Well, no ... It depends on if he was innocent or not." She was then asked, "And if you had a doubt, ... would you say ... maybe I will side with the State or would you find him not guilty?" She answered, "No, I would still side with the State."

The prosecutor then asked if she would "keep" [the prosecutor] to proving that burden [sic] beyond a reasonable doubt and not making it any less for [the prosecutor] just because [the prosecutor] called a police officer to the stand?" Her answer was "Yes." She also answered "yes" when asked if she could "follow the law the judge gives" her.

The judge pointed out that when she was first asked about the State's burden of proof and being able to follow the law she said would be able "to follow the law," but had first said, "I think so." He then asked, "What do [sic] you mean when you said, 'I think so?' Her answer was, "Well, yes."

When directly asked if she would require the State to meet its burden of proof and follow the law, Vega answered, "yes." The trial judge heard the answers and was able to observe the manner in which Vega answered and to note her demeanor and body actions, and he obviously concluded that some of her answers were due to a lack of a clear understanding of the questions. We cannot say that in so finding he abused his discretion.

B. *Charles Kimbrough*

█ The challenge to Kimbrough is based on Mata's contention that Kimbrough would not require the State to prove that Mata was intoxicated while driving, but felt that proof of intoxication an hour or more after the defendant was arrested was sufficient to prove that defendant was intoxicated when driving.

Mata is not completely unjustified in asserting that Kimbrough's answers to questions by Mata's counsel indicate an unwillingness to follow the requirement of the statute that the State must prove that the defendant was operating a motor vehicle on a public highway at a time when he was intoxicated. But questioning of Kimbrough by the trial judge produced sufficient evidence to support a contrary conclusion.

The judge first told Kimbrough that it was important that he understand that the State had the burden of proving its case, and that

... [S]imply the fact that they get a particular [breath test] result doesn't indicate, necessarily, that the defendant was guilty of driving while intoxicated at the time and place in question unless the State has been able to prove that to you. Do you understand that?

Kimbrough answered, "Yes, sir. I do."

He then said he "would be able to follow the court's instructions, the legal instructions of the court in determining the guilt or innocence of the defendant."

We believe that Kimbrough's answer to the court's questions concerning the court's instructions are sufficient to justify the judge's conclusion concerning the absence of bias, or prejudice, and Kimbrough's willingness to follow the trial court's instructions. We cannot hold that the judge abused his discretion in so holding.

### OBJECTIONS TO THE CHARGE

█ In his last two points, Mata complains of the trial court's refusal to give his requested jury instruction and overruling his objection that the charge, as given, erroneously reduced the State's burden of proof.

Paragraph III of the charge instructed the jury that if they found from the evi-

**4**

dence beyond a reasonable doubt, that on or about the date in question in Bexar County, the defendant,

> Raul Mata, was intoxicated, and while so intoxicated, did drive or operate a motor vehicle, in a public place, then you will find the defendant guilty as charged.

In Paragraph IV of the charge, the jury was instructed that defendant would not be guilty if he was not intoxicated, even if they believed beyond a reasonable doubt that he operated a motor vehicle at the time and place in question. The charge added:

> Therefore, if you find that the defendant was not intoxicated at the time and place in question, or if you have a reasonable doubt thereof, you will find the defendant not guilty.

Mata complains that the charge does not "pin down" the "relevant point in time which the statute requires of the State's proof, that is, while defendant was in actual, physical control of a motor vehicle." Mata says the charge is defective because it does not require that the State relate back the breath test scores with metabolism facts proving beyond a reasonable doubt that defendant was intoxicated as alleged in the complaint. Therefore, Mata says, the charge erroneously reduces the State's burden of proof.

Mata's requested special instruction would instruct the jury that they must be convinced, beyond a reasonable doubt "that an inference ... can be made from the results of the chemical test that the defendant had a 0.10% or higher alcohol concentration in his body [sic] at the time he was in actual physical control of a motor vehicle." The requested charge would instruct the jury that if they did not find "such an inference beyond a reasonable doubt, or if they did not find that the State had shown the alcohol concentration in defendant's body at the time he was driving, 'beyond a reasonable doubt,'" they must find the defendant not guilty of driving while intoxicated while having an alco-

hol concentration of 0.10 or higher in his body.

The court's charge defined "intoxication," as does the statute, in terms of (1) a person not having the normal use of his mental or physical faculties by reason of the introduction of alcohol into his body, or (2) having an alcohol concentration of 0.10 or more. The charge's instruction that the jury was required to find beyond a reasonable doubt that Mata was "intoxicated" when driving in no way reduced the State's burden of proof. The jury was plainly told that, in order to convict Mata, they must find beyond a reasonable doubt that he was operating a motor vehicle on a public highway while the normal use of his mental or physical faculties was alcohol-impaired, or while having an alcohol concentration of 0.10 or more. Neither the statute nor case law requires that the court instruct the jury concerning the type of evidence which the State must produce. The only requirement is that the State produce evidence which convinces the jury of defendant's guilt beyond a reasonable doubt. Mata presents no point arguing that the evidence does not support the verdict.

CONCLUSION

The judgment of the trial court is affirmed.

Dissenting Opinion by: CARLOS C. CADENA, Chief Justice (Retired).

CARLOS C. CADENA, Chief Justice (Retired), dissenting.

I agree that the trial court did not err in denying appellant's challenges for cause during voir dire, refusing appellant's requested jury instruction, and overruling appellant's objections to the jury charge. However, I am convinced that the trial court committed error in failing to suppress the challenged testimony of George McDougall concerning the range of appellant's blood alcohol concentration (BAC) at the time he was operating the motor vehi-

cle. (Much of the testimony in the record refers to appellant's BAC at the time he was arrested. I will use the time of arrest in this dissent, since all discussion regarding appellant's BAC prior to the breath test refers to the time which elapsed between the time of arrest and the time of the subsequent breath test. There is no testimony concerning the time appellant was stopped, and he does not here assert that the time intervening between the time he was stopped and the time of his arrest is significant, although the testimony shows that the arresting officer had appellant perform four roadside sobriety tests between the time he stopped appellant and the time of the arrest. I will assume that all references to appellant's BAC at the time he was arrested can justifiably be interpreted as referring to appellant's BAC when he was operating the motor vehicle. If this assumption is unwarranted, then there is no evidence concerning appellant's condition when he was driving, which simply means that there is no evidence showing that appellant was operating the motor vehicle at a time when his BAC was at least 0.10%. Further, throughout this opinion I will omit the zero preceding the decimal point and will omit the percentage symbol following the last numeral used in identifying the BAC. Therefore, the description of BAC in terms such as, for example, .12, should be interpreted as a BAC of 0.12%.)

Before stating the reasons for my dissent, I think it necessary to show that appellant's complaint concerning McDougall's testimony is properly before us.

The State contends that we may not consider appellant's complaint concerning the trial court's failure to suppress the testimony of McDougall because this complaint was not presented to the trial court. The State correctly points out that appellant's motion to suppress only sought suppression of testimony concerning the result of the breath test, while his points of error here complain of the admission of McDougall's testimony concerning appel-

lant's BAC at the time of the offense. But the State is mistaken when it asserts that appellant did not make known to the trial judge his complaint concerning the admission of the McDougall testimony which he challenges in this court. Appellant made it clear to the trial court that he sought suppression of McDougall's testimony relating to appellant's BAC more than two hours before the breath test.

At the conclusion of the testimony at the hearing on the motion to suppress, appellant moved that the trial court suppress McDougall's testimony that appellant's BAC at the time of the offense was more than .10. Appellant's counsel told the court that McDougall's testimony should be suppressed because it was completely unreliable in the absence of evidence of the rate at which appellant absorbed and eliminated alcohol. Counsel told the court that McDougall's testimony was inadmissible in the absence of evidence of appellant's drinking behavior, weight, and physiology.

When appellant's counsel concluded his argument in support of the motion, the trial court, having previously announced that he did not wish to hear argument by the State, said that, relying on the testimony presented by the State, he was denying appellant's motion "on all points."

At the trial on the merits, when the State attempted to have McDougall testify to appellant's BAC at the time of the offense, appellant was permitted to conduct a *voir dire* examination of the witness outside the presence of the jury. The jury was removed from the courtroom while appellant questioned McDougall concerning his opinion. At the conclusion of the *voir dire* examination, appellant argued that the witness did not have a sufficient basis for his opinion concerning appellant's BAC at the time of the offense because there are so many "variables," including whether appellant's peak BAC (the time when the alcohol concentration in appellant's blood reached its highest point) occurred before or after the test; and the "range [of appellant's BAC]" more than

two hours before the test "is so broad that it doesn't tell the jury anything about" appellant. Counsel insisted that "under the rules" McDougall had no sufficient basis for any testimony about appellant's range. Appellant was willing to concede that McDougall is qualified to "service those machines" and to "talk about the average person and the many people he has observed drinking and taking this test," but insisted that the witness lacks sufficient information to talk of a range specifically applicable to appellant.

The trial court said he was going to allow McDougall's testimony, and when appellant asked him if he had "ruled," the court answered, "I overrule the objection."

According to Tex.R.App. P. 33.1(a), a complaint is preserved for appellate review if a party presents to the trial court "a timely ... motion, stating the specific grounds for the ruling" he desires the court to make and obtains a ruling on the motion. All that is required is denial of a motion presented to the trial court so that the court is given an opportunity to prevent error.

The record shows that appellant objected to and sought suppression of McDougall's opinion testimony concerning appellant's BAC more than two hours before the test, and told the trial court why he was entitled to that ruling. This was done early enough to enable the court to understand what appellant wanted at a time when the judge was in a position to do something about McDougall's testimony. Appellant did all that Rule 33.1(a) required him to do to preserve his complaint for consideration by this Court. *Lankston v. State*, 827 S.W.2d 907, 909 (Tex.Crim.App. 1992). This conclusion finds additional support in *Mason v. State*, 740 S.W.2d 517, 518 (Tex.App.—Houston [1st Dist.] 1987, pet. ref'd), where the court, after rejecting the State's argument that a plea of misjoinder of offenses can be raised only by a motion to quash the indictment, held that appellant had preserved his plea of misjoinder for appellate review by a timely oral objection to such misjoinder.

Appellant's points complaining of the admission of McDougall's testimony are properly before us.

Since appellant does not complain of the admission in evidence of the result of the breath test, we need not consider any evidence concerning the function of the Intoxilyzer, the qualifications of the officer administering the test, or the manner in which the test was performed.[1] According to *Kelly v. State*, 824 S.W.2d 568, 573 (Tex.Crim.App.1992), we need consider only evidence presented outside the presence of the jury concerning the admissibility of McDougall's testimony relating to his opinion of appellant's BAC at the time of

1. Generally, the courts, including the Texas courts, have shown no reluctance in admitting evidence of the results of breath tests, regardless of the device which was used. Apparently, the courts were significantly impressed by the fact that the device in question had been adopted for use by law enforcement agencies. In *McKay v. State*, 155 Tex.Crim. 416, 235 S.W.2d 173 (Tex.Crim.App.1950), the Court took judicial notice of the accuracy of the Harger Drunkometer, although the State's expert testified that scientists disagreed on the accuracy of the machine. In holding that such disagreement was of no consequence, the Court, after judicially noticing that the earth is round although many persons (the Court said "persons," not "scientists") still believed it was flat, added that whatever scientific theory might be advanced, at least one scientist could be found to dis-

agree with it. (It is not clear whether the Court took judicial notice of this last conclusion). None of the articles from which the Court quoted in its opinion mentioned the Harger Drunkometer. Apparently, no Texas Court ever thought it important to point out that, eventually, the Drunkometer's use was limited to the detection of the presence of any alcohol and its use as indicator of the amount of alcohol concentration in the blood was discontinued. The fact that Harger, the developer of the device, admitted that simultaneous blood tests and Drunkometer tests revealed errors of as much as 32% also escaped judicial notice. R. Erwin, *Defense of Drunk Driving Cases*, 23.03. Nor have the courts paid significant attention to the fact that the development of new devices underlines the shortcomings of those previously in use.

the offense. The only relevant testimony is the testimony of McDougall at the hearing on the motion to suppress and during the his voir dire examination by appellant at the trial on the merits.

## HEARING ON MOTION TO SUPPRESS

McDougall is the breath test technical supervisor for Bexar County. In order to be qualified as a breath test technical supervisor, a person must have a bachelor's degree in chemistry or its equivalent and must have completed the breath test technical supervisor course specified by the Texas Department of Public Safety (TDPS).[2]

McDougall does not know appellant and does not know: (1) how much appellant weighed at the time of the test; (2) what, if anything, appellant had been drinking; (3) when appellant had started drinking; (4) when appellant stopped drinking; or (5) whether appellant had eaten anything before or while drinking.

Appellant's BAC as revealed by the breath test gives no clue concerning his BAC two hours earlier when he was driving. McDougall cannot say that appellant was intoxicated at the time of the offense, because, "right now," he doesn't know when appellant was arrested. [It is clear that McDougall's subsequent testimony concerning appellant's prior BAC is sometimes based on the fact that the police report showed that appellant was arrested two hours and ten minutes before the breath test.]

McDougall can extrapolate from the time of the breath test to the time of arrest so that he can confidently testify that appellant's BAC at the time of arrest was more than .10.

McDougall explained his extrapolation process. "I assume certain variables. And I cannot give you a specific number for a previous period in time because there are several probabilities. So, using the possibility that he was a higher [BAC] at the time of arrest, and what the highest

2. According to the TDPS 1990 publication, TEXAS ALCOHOL TESTING PROGRAM OPERATOR MANUAL, of which McDougall was a co-author, the minimum qualifications are (1) a bachelor's degree from an accredited university or college with a major in chemistry or in another scientific field with at least 18 hours in chemistry, or other qualifications as determined by the Scientific Director; (2) completion of a course of instruction required for certification as operator of breath control testing instrument; (3) completion of technical supervisor training approved by the Scientific Director, which shall include (A) advanced survey of current information concerning alcohol and its effects on the human body; (B) operational theories and principles applicable to program; (C) instrument operations, maintenance, repair, and calibration; (D) legal aspects of breath alcohol analysis; (E) principles of instruction; and (4) knowledge and understanding of the scientific theory and principles concerning the operation of the instrument and reference sample device; proof of engagement in a certified program or certified school of instruction, or proof of pending engagement upon receipt of certification. TDPS Manual, sec. 19.5, pp. 8–12.

According to Sec. 19.6(x) of TDPS BREATH ALCOHOL TESTING REGULATIONS, found on p. 8.18 of TDPS Manual, the primary function of the technical supervisor is to provide the technical, administrative, and supervisory expertise in safeguarding the scientific integrity of the breath alcohol testing program and to assure that program's acceptability for evidential purposes. In matters pertaining to breath alcohol testing, he is the field agent of the scientific director. Supervision by him shall include, but not be limited to: (1) supervision of certified operators in performance of breath alcohol test operations; (2) supervision of data gathered for initial certification of individual instruments and reference sample devices in an assigned area; (3) supervision of techniques of testing, maintaining scientific integrity and upholding these regulations as they apply to the certification of a total testing program; (4) selection and supervision of a testing location as it applies to security and technical suitability for testing; (5) supervision of compliance with the policy of public information and demonstrations of breath alcohol testing instruments and equipment; (6) all technical, administrative, and regulatory aspects of breath alcohol testing within a designated area; and (7) expert testimony by direct testimony or by written affidavit concerning all aspects of breath control testing within an assigned area.

would have been, and if we knew what it was at the time of test, and what it could have dropped to or could it have been higher. The other possibility is how low it could have been and still have time to arrive at the concentration of what we see on the test record, if he were rising at the time of the test. And between these two somewhere is where the actual value will be."

McDougall was handed Defendant's Exhibit 4, which he identified as being in "the manual." [The reference is to the 1990 revision of the TDPS publication, TEXAS BREATH ALCOHOL TESTING PROGRAM OPERATOR MANUAL which, in the Preface, lists McDougall as one of six Technical Supervisors who acted as co-authors. This publication, which will be referred to in the remainder of this opinion as "Manual," was revised in 1996]. The exhibit depicts the alcohol concentration curve of a person "starting when he didn't have anything to drink until long after the peak had been reached."

In order to determine whether a person is in the absorption stage [the period of time which begins immediately after the consumption of alcohol and continues until all of the alcohol has been absorbed into the bloodstream from the stomach and the small intestine] or the elimination phase, during which alcohol is being eliminated from the blood faster than it is being absorbed. "You must have a lot of [test results] in order to draw a full curve."

Appellant's Exhibit 3 is another chart taken from the Manual. It shows another alcohol concentration curve. In order to draw an alcohol concentration curve to determine whether a person is in the absorption phase or the elimination phase it is necessary to have "many readings," that is, blood, urine or breath tests repeated periodically. The result of a single intoxilyzer test does not indicate whether the person tested is in the absorption phase or elimination phase. The intoxilyzer is not designed to do that. A breath test gives no information other than the BAC of the person tested at the time of the test.

Ingested alcohol passes from the mouth into the stomach, where some of the alcohol is absorbed into the blood stream, even if the stomach is empty. From the stomach the alcohol passes into the small intestine and is rapidly absorbed into the bloodstream. If there is food in the stomach the passage of the alcohol into the small intestine does not occur until the food in the stomach is digested. This delays the absorption of alcohol, particularly if the food in the stomach consists of fatty food like meat and potatoes.

After it is absorbed into the blood, the alcohol is carried by the bloodstream through the various organs of the body, passing first to the liver, where the process of elimination begins. Appellant's Exhibit 1, showing the distributive pathways, is a reproduction of Figure 3 in the Manual.

If a person's breath test shows a BAC of .15 or more, he is as intoxicated as if he were under a general anesthetic.

If a breath test given two hours and nine minutes after a person's arrest shows a .196 BAC, this would indicate he had a higher BAC at the time of the test than when arrested. If a person blows a .19 two hours after being arrested, in all probability that person would have blown at least a .10 when arrested, assuming he had nothing to drink after he was arrested.

A person who blows a .19 would not be "completely oblivious" to pain, although he would be "more oblivious than if he had no alcohol." A person who blew a .19 would be unable to drive safely and would have some loss of physical or mental use of his "abilities."

Appellant's Exhibit 2, also taken from the Manual, shows that if a person drinks on a stomach full of fatty foods, the digestive process in the stomach is slowed down and this will cause a much slower rate of absorption of alcohol into the bloodstream. It will take a while for that person to reach

a peak, regardless of how much he had to drink. But it would take no more than 90 minutes for a complete absorption of all the drinks. "It doesn't take two hours to digest a stomach full of food." All of the alcohol would be absorbed in 90 minutes.

McDougall does not know whether appellant had anything to eat. It is true that, based on the parameters set out in a chart which he has seen and which was prepared by NHTSA, if a person drinks on an empty stomach, his BAC can rise to .10 or more in as little as one hour, but if he drank on a full stomach it will rise to "less than half of that" in two hours. McDougall has "no real reason" to disagree.

McDougall is saying that at the time appellant was driving he was "impaired and had lost the normal control of his mental or physical faculties."

He is not saying that appellant had a BAC of .10 or higher. He is saying that appellant had a BAC of "at least .08 or higher." In his opinion, if a person has a BAC of .08 he has lost the normal use of his mental or physical faculties as the result of ingesting alcohol. He agrees that "the statute speaks only of a .10 or more."

McDougall cannot give "an individual number" concerning appellant's BAC two hours before the test, but he can give "a range." He "thinks" it is possible for the person to be "as much as a .06 less than a .19", two hours and ten minutes before the test. "It could have been as low as a .12 or a .13 . . . at the low end, and somewhere about a .25 at the high end, somewhere in between there."

He is not saying that there is no possibility that appellant's BAC two hours before the test could have been lower than a .10. There is an extreme situation where it could have been less than .10, but he has no knowledge of that. The figures he has given are just estimates.

McDougall's statement on cross that if appellant blew a .196 two hours after he was arrested, the "low end" of the range of appellant's BAC at the time of arrest would be .102 was based on the assumption that appellant had drunk on an empty stomach. [This testimony is somewhat puzzling, since the record contains no statement by McDougall concerning a BAC of .102. The mention of a .102 BAC is found only in the question by the prosecutor.] If appellant had a full stomach when stopped, "he would have been higher than that," but McDougall cannot tell what it would have been. When pressed to give a "guesstimation," he said appellant "could have been as low as, say, maybe a .16 on a full stomach and not quite as high as a .25, maybe a .21 or .22."

## VOIR DIRE

McDougall does not know when appellant began drinking or when he stopped drinking, and he assumes appellant did not drink after his arrest. [This assumption is correct]. He does not know when appellant reached the peak BAC. His only reference point is the result of appellant's breath test, but McDougall is prepared to testify about the level of alcohol in appellant's blood stream two hours before the test.

He is familiar with a chart which plots the BAC "in the nature of absorption and elimination phase" of a person who has consumed alcohol. The chart shows the person had a breath test at 2:45 which showed a BAC of .08. The person eliminated alcohol "at about a .02 per hour, something like that." If the person peaked at .10 one hour before the test, this would be consistent with a test showing a .08 BAC one hour later. This would be one possibility if he peaked at .10 one hour before the test.

Based on these assumptions, McDougall can testify that if the person was arrested at 1:15 his BAC at that time would have been between .045 and .089.

If it is assumed that the time of the peak is unknown and that all that is known is that he scored .08 on the test given two hours after the arrest, McDougall can give

a range even if he doesn't know when the person began drinking, what he had to drink, or how much he weighed.

McDougall can do this by "looking at all of the possible peak points." If the peak occurred at or before the time of arrest, the BAC was decreasing until the time of the test. This would give him his "maximum range." Applying the elimination rate of .02 [per hour], the person's "peak" two hours before the test would be .12.

The peak could have been before the arrest, but even in that case he would have been eliminating at the .02 rate during the two hours intervening between the time of the arrest and the time of the test, and he would have been at .12 and "coming down to where he was at .08 at the time of the test."

McDougall doesn't know "exactly where the peak is," but if it was anywhere before the time of arrest he would have reached .08 at the time of the test. The peak would have to be before or at the time of arrest at .12.

The hypothetical person they are talking about could have started drinking the day before and had been at .40 "and maybe coming down to a .08 24 hours later, or something of that nature, because he is eliminating at a constant rate."

Following a recess, the chart to which the witness and appellant's counsel had been referring was identified as DX 1.

McDougall would not commit to the numbers reflected on the chart, although he would commit to the principles. McDougall will not state that a person can increase as rapidly as shown on the chart.

He is also familiar with a chart prepared by NHTSA concerning a study done on a chug-a-lug situation, where the BAC of a person who drank on an empty stomach rose to .10 in an hour. He would not agree with such a rapid rise because the study does not concern what he would call a normal drinking situation.

McDougall can testify about "this range right here" because he has two knowns. He knows the result of the breath test, and he knows "the standard elimination rate which is pretty standard among all persons," so that he can calculate the range, "in theory."

The situation changes if the peak occurs after the test, because, "we have a different rate of absorption depending upon the circumstances of the individual and the amount of alcohol and what that person has had to drink and perhaps their weight and when they began drinking and when they stopped drinking. All of these variables create a different rate of absorption." But McDougall doesn't know of any situation where a person would be in the absorption stage after an hour. If the person drank just before he was arrested, his BAC would be rising for an hour and then he would peak. McDougall doesn't know of any situation where the person would peak two hours later. If a person drank on an empty stomach he would peak in about 30 to 45 minutes. If the person drinks after having a meal of meat and potatoes, he would peak "somewhere around an hour to an hour and a half, at the very most." It would not be possible to peak two hours later. He has to peak in about an hour."

The NHTSA chart does show that a person who drank after a meal of potatoes peaked "right at about two hours." The problem with that chart is that it concerns a situation where the peak was at .04, and that is a very limited alcohol concentration. It is a very small amount of alcohol "in the amount of potatoes." It varies greatly with more alcohol. It would not be delayed as much for a greater amount of alcohol. "Potatoes can't dilute the alcohol any more than potatoes [sic] can dilute the alcohol." While food slows down the system and slows down the alcohol getting into the "gut," [3] that is also dependent

3. It is obvious that "gut" refers to the small    intestine. The presence of potatoes in the

upon the concentration of the alcohol and the amount of the alcohol. The amount of alcohol consumed in the study reflected by the NHTSA chart is a limited amount. It is just two ounces. It is true that the chart shows that the person consumed two ounces of pure alcohol in eight ounces of water, which is equivalent to 5 drinks of 80 proof vodka. If we include a chug-a-lug situation, there is a lot of variety.

In the situation depicted in DX 1, McDougall will agree that the peak might be after the test, if you don't know the variables affecting the absorption rate, "our range is so broad here in terms of the [BAC] that it really doesn't tell us anything about what that individual's breath test result was at the time of the arrest because it could have been anywhere from zero to .20." But his agreement is limited to the example shown in the exhibit. At levels above a .10, he would not agree.

In appellant's case, the test revealed a BAC of .19. [Although the revealed BAC was .196, the third numeral is of little importance and the breath test results are usually expressed only to two decimal places.] All the information McDougall has is the result of that test. But he thinks he can assume a normal drinking pattern. He can't assume a chug-a-lug situation as normal. "In my drinking experience that is very unusual." He will not give an example based on a very unusual situation. There are persons who drink that much "but not chug-a-lug."

McDougall knows nothing about appellant or his drinking habits or what he had to drink on the night in question, so he "can't factor in" any of these variables. But he can state the "parameters" under which he is making his hypothetical answer, and counsel for appellant "can live with that" or can illustrate the limitations of "my parameters." But McDougall

thinks his parameters are very well within the bounds of what "we are going to find."

McDougall is saying that he is basing his parameters on some hypothetical individual, on a normal drinking individual. He is not adverse to explaining what his parameters are, and the jury can assume those parameters and they can understand the parameters he is using. McDougall is not using any magic.

A chug-a-lug is one possibility that would not be considered normal. He is not saying that he would limit his testimony not to appellant but to a hypothetical individual who is not appellant. He would explain what is normal and if counsel were to bring up other parameters he would tell him what those other parameters would do to an individual. He will explain it and lay it all out, but he doesn't think that counsel's premise that a person can reach a .10 after drinking all the alcohol before he was arrested, and that he was arrested at a .0 is reasonable at all.

Counsel, after agreeing that "it" is an "extreme at one end," asked if McDougall would agree that there is also an extreme at the other end, that some individual could have been drinking for a long period of time and achieved a high level of alcohol concentration in his system, perhaps several hours before, and then continued to rise for period of time. McDougall said he agreed that the BAC could continue to rise for up to an hour and a half. For more than that he cannot agree. It has not been his experience, and he has tested thousands of individuals and it has not been his experience that their BAC rises more than an hour and a half after their last drink. The chart they discussed is not a survey. It is an experiment done with a gulp of five ounces of liquor followed by a measure of the BAC. When asked if he agreed that "one was done on a full stomach and one on an empty stomach," instead

stomach will slow down the rate at which alcohol will pass from the stomach into the small intestine, since this will not happen until all the food in the stomach has digested.

If the passage of alcohol from the stomach into the small intestine is delayed, the absorption of alcohol from the small intestine into the blood stream will necessarily be delayed.

of answering the question he said he "was not going to accept the two hours as an absolute, adding that in his experience, with all of the studies [he has] read it is between half an hour to an hour and a half to reach a peak, after drinking on a full or empty stomach." Within the limitations of "that graph" they "could" have been talking about an hour and a half and it looks like two hours. It is not very significant.

He agrees that there is a broad range and he doesn't know how broad that range is, but he thinks he can make an estimate, based upon some hypothetical average, based on what he would consider normal drinking behavior. McDougall repeated he did not know what appellant had to drink or what he had to eat. He does not know when appellant began drinking or stopped drinking. When asked if his hypothetical dealt with an average person or reasonable person, and not specifically with appellant, he answered, "With a reasonable possibility of drinking, yes." McDougall added his hypothetical was based on what he considered to be "the reasonable possibilities of drinking."

At this point DX 1 was admitted.

After appellant's objection to McDougall's testimony was overruled, the jury was returned to the courtroom, and no other evidence concerning the admissibility of the evidence was heard outside the presence of the jury.

## ADMISSIBILITY OF THE EVIDENCE

The parties agree that the admissibility of McDougall's evidence concerning what he described as the "range" of appellant's BAC at the time of the alleged offense is governed by Rule 702 of the Texas Rules of Criminal Evidence (hereinafter the "rule"), which insofar as applicable here, provides that if "scientific knowledge"[4]

will help a jury to determine a fact in issue, evidence of such scientific knowledge may be given by a witness qualified as an expert by "knowledge, skill, experience, training, or education." Before the question of admissibility can be determined, the criteria for admission of such evidence and the burden of proof which must be met by the proponent of the proffered evidence must be considered.

### A. Criteria for admissibility.

According to *Hartman v. State*, 946 S.W.2d 60, 63 (Tex.Crim.App.1997), hereinafter referred to as "*Hartman 1*," the admissibility of the challenged testimony must be determined by applying the rules announced in *Kelly v. State*, 824 S.W.2d 568 (Tex.Crim.App.1992), concerning the admissibility of scientific evidence under the rule.

*Kelly* held that scientific evidence is admissible only if it is "sufficiently relevant and reliable to help the jury in reaching accurate results." 824 S.W.2d at 572. Such evidence is reliable only if both the scientific theory and the technique for applying it are valid and the technique has been properly applied in the case before the court. *Id.* at 573.

### B. The State's burden of proof.

The State concedes that it had the burden of proving the admissibility of the testimony by establishing its reliability. The problem to be considered concerns the quantum of evidence which the State was required to produce to discharge its burden. As will be seen later, the question of allocating the burden of persuasion and the question of determining the required quantum of evidence are made more difficult by the opinion of the Court of Criminal Appeals in *Emerson v. State*, 880

4. The rule speaks of evidence of scientific knowledge. The term "scientific evidence" appears nowhere in the text, although the courts generally talk about scientific evidence rather than evidence of scientific knowledge. Such usage results in no harm as long as it is understood that "scientific evidence" refers to evidence of scientific knowledge. The term "scientific evidence" is used throughout this opinion as referring to evidence of scientific knowledge.

S.W.2d 759, 761 (Tex.Crim.App.1994). I will first discuss the questions concerning burden of persuasion announced in *Kelly* and then consider the problem raised by the holding in *Emerson* that a court may take judicial notice of the scientific literature not mentioned in the evidence in order to determine the reliability of the proferred evidence.

*Kelly* involved the admissibility of evidence concerning the horizontal gaze nystagmus (HGN) 'fingerprint' test. 824 S.W.2d at 569. The Court considered the challenged testimony as "novel scientific evidence;" apparently meaning to characterize the evidence as evidence concerning a novel scientific theory. The Court said, "The proponent of novel scientific evidence must prove to the trial court, by clear and convincing evidence and outside the presence of the jury, that the proffered evidence is reliable." *Id.* at 573. The Court pointed out that it was not necessary, in that case, to decide "what burden of persuasion is applicable under [Rule] 702 when the scientific evidence offered is not truly novel." *Id.* at n. 13.

The holding in *Hartman* 1, *supra,* precludes the conclusion that the statement in footnote 13 in *Kelly* is a holding that the "clear and convincing evidence" burden of proof applies only where the scientific evidence is novel. *Hartman* held that the relevance and reliability could not be limited to cases involving novel scientific evidence. 946 S.W.2d at 62. In reaching this conclusion, the Court, after saying that it found no value in having a different standard of admissibility depending on whether or not evidence is novel, added, "[T]he problems presented in determining whether or not a particular type of evidence is novel are daunting enough to reject application of a dual standard." *Id.* at 63. There is no basis for believing that the problems which the Court found so daunting in *Hartman* will disappear when the attempt to make the distinction is for the purpose of applying a dual standard of burden of proof rather than for the purpose of applying a dual standard of admissibility.

In *Emerson,* the Court said that it would consider the scientific evidence regarding the HGN test to be novel because no case had held that such evidence was reliable. 880 S.W.2d at 763. Even if the "clear and convincing evidence" standard is applicable only in cases involving novel scientific testimony, there is no problem in this case. Under the test applied in *Hartman,* the evidence in this case is novel scientific evidence, since I have found no final holding that the theory or technique employed in retrograde extrapolation as applied by McDougall is reliable. Therefore, the State's burden in this case was to prove the admissibility of the McDougall evidence by clear and convincing evidence presented outside the presence of the jury.

When the State's burden of proof is considered in this case, the holding in *Emerson* concerning judicial notice of scientific facts cannot be overlooked.

In *Emerson,* Sharon Lee Emerson sought reversal of her DWI conviction because the trial court allowed the arresting officer to testify concerning her reaction to the horizontal gaze nystagmus (HGN) test which he had administered to her on the highway at the scene of the arrest as one of the "roadside sobriety tests." (Although horizontal gaze nystagmus is sometimes called "alcohol gaze nystagmus," or "AGN," in this opinion I will use the term HGN).

The problem in *Emerson* was that, unlike the situation in *Kelly,* the State presented no evidence showing the validity of the scientific theory and the technique for its application. Under the *Kelly* rules concerning the admissibility of scientific evidence, the trial court erred in admitting the HGN evidence.

The *Emerson* opinion avoided reversing the conviction by inquiring, on its own motion, into the reliability of the scientific theory and technique "pursuant to the doctrine of judicial notice." 880 S.W.2d at

764. An appellate court may take judicial notice of facts outside the record although not requested to do so by any party and without notifying the parties of its intention to do so because judicial notice is part of the inherent power of trial and appellate courts. Specifically, the Court said it was authorized to take judicial notice of any scientific fact which "is capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned." *Id.*

After noting that the effect of alcohol on nystagmus, specifically HGN, is "well documented," the Court recognized that nystagmus may be caused by factors other than alcohol, "such as other drugs, neurological disorders, or brain damage." 880 S.W.2d at 766. The Court then noted that NHTSA in its publication, *Improved Sobriety Testing,* 1 (1984), concluded that the HGN test is the "single, most effective field sobriety test in determining whether an individual is alcohol-impaired." *Id.*

After consulting "literature concerning alcohol and its effects on human eye movement, and considering case law from other jurisdictions addressing the reliability of the HGN test," the Court found that the theory underlying the test is sufficiently reliable "pursuant to ... Rule ... 702." *Id.* at 768. The Court added that the scientific materials addressing the issue have reached the uniform conclusion that the consumption of alcohol has a "cognizable effect on human eye movement," and expressed its belief that the accuracy of the sources "cannot be reasonably questioned." *Id.*

The Court then found that the technique employed in the HGN test "as designed by NHTSA is reliable," citing the NHTSA publication, *Improved Sobriety Testing* (the source of its previous statement about the efficiency of the HGN test). 880 S.W.2d at 768. In Texas, officers administering the test receive "standardized training in its administration and must follow the standardized procedures" outlined in NHTSA's *DWI Detection Manual. Id.* These standardized procedures require that the officer "screen for factors other than alcohol that may contribute to cause nystagmus, such as drugs, neurological disorders, and brain damage, prior to administering the test." *Id.* Because of these required procedures, the Court held that the technique employed in the HGN test "is a reliable *indicator of intoxication." Id.* (Emphasis by the Court.)

The finding that both the theory and technique of the HGN test were valid led to the conclusion that the testimony concerning the reaction of the defendant to the test was properly admitted.[5]

Although the Court recognized that the HGN test is a reliable indicator of intoxication, it refused to extend such finding of reliability to NHTSA's contention that the test is reliable as an indicator of a precise BAC (specifically, a BAC of at least .10). This refusal to recognize the test as a reliable indicator of a BAC of at least .10 was based on the fact that NHTSA's "lab experiment [showed] a margin of error of .032%, and [on] the dearth of other published writings on the accuracy of NHTSA's formula and technique." (The Court did not mention published writings, which will be discussed later, criticizing NHTSA's methodology and conclusions.). These factors prevented the Court from

---

5. The officer who administered the test in *Emerson* received his HGN training at a 3–day "state school" in Bexar County at which he was "introduced" to a "battery" of field sobriety tests "advocated" by NHTSA. It was during this introduction to a battery of tests that he learned how to administer the HGN test. 880 S.W.2d at 762. The number of tests to which he was introduced during the 3–day period in addition to the HGN test is not revealed. The *Emerson* court's reliance on strict adherence to the NHTSA's "standardized procedures" may not be warranted. In the case now before this court, the officer who administered the roadside HGN test to Mata testified that at the school he attended in Bexar County he was taught that the only causes of HGN were consumption of alcohol and mental illness.

taking judicial notice of the reliability of the HGN test "within the context of determining precise BAC based on the angle of onset of nystagmus." 880 S.W.2d at 769.

As far as the HGN test is concerned, *Emerson* holds only that an officer who "has received a practitioner certificate by the State of Texas to administer the HGN test" qualifies as an expert on the administration and technique of the test and may testify concerning a defendant's performance on the test, "but may not correlate the defendant's performance on the HGN test to a precise BAC." *Id.* at 768–69.

Comment on *Emerson* and its effect on the decision in this case will be reserved until a subsequent portion of this opinion.

*Emerson* impliedly suggests there is no scientific literature questioning the reliability of the HGN test or of the technique applied by a police officer administering the test on the highway in the early morning hours by passing an object across the subject's field of vision and estimating the angle of eyeball deviation at which the unusual eyeball behavior begins. In fact, the methodology of the study on which the *Emerson* majority heavily depends for its finding that the HGN test is "a reliable indicator of intoxication" has been seriously questioned. *See* 3 Nichols, DRINKING/DRIVING LITIGATION, CIVIL AND CRIMINAL, Sec. 25.01 (1995) and the scientific literature there cited. The Court's statement that the sources on which it relied "cannot be reasonably questioned" is subject to being reasonably questioned.

The *Emerson* opinion recognized that nystagmus may be caused by factors other than alcohol consumption, such as other drugs, neurological disorders or brain damage, and stressed the fact that in Texas officers who administer the test are required to screen for possible other causes such as the three previously mentioned in the opinion. 880 S.W.2d at 766. Possible causes of HGN, other than ingestion of alcohol, include problems in a person's inner ear and physiological problems such as influenza, streptococcus infections, vertigo, measles, syphilis, arteriosclerosis, muscular dystrophy, multiple sclerosis, Karsakoff's Syndrome, brain hemorrhage, epilepsy and hypertension. There is evidence that eye strain, motion sickness, sunstroke, eye muscle fatigue, and glaucoma may bring about HGN, and that the time of the day may affect the angle at which nystagmus is first observed. *Id.* Consumption of such common substances as caffeine, nicotine, and aspirin have been found to result in nystagmus almost identical to that resulting from drinking alcohol. *Id.*

In view of the numerous causes of HGN other than alcohol, the conclusion that the presence of HGN is a reliable indication of intoxication is not entirely convincing. It is not easy to believe that a police officer is competent to determine that the HGN which he detects is attributable to ingestion of alcohol.

*Emerson* failed to take notice of studies which reveal that 50 to 60 percent of the population, will show a gaze nystagmus indistinguishable from HGN if they deviate their eyes more than 40 degrees to the side. Toglia, ELECTRONYSTANOGRAPHY: TECHNICAL ASPECTS AND ATLAS (1976). The NHTSA test which police are instructed to use is in terms of deviation at an angle of 45 degrees from the subject's nose. The result of NHTSA tests would necessarily result in a number of "false positives," since persons with a BAC below .10 would nevertheless be classified as having a BAC of at least .10 or, at the very least, that their eye movement problem was the result of intoxication. NHTSA was aware of this problem and avoided it by administering a placebo, a drink with no alcohol, to all persons scheduled for testing who showed signs of moderate to strong HGN at zero BAC. This precaution effectively screened out persons at high risk of being incorrectly identified as positives. The procedure is explained in NHTSA=DOT—HS–805–864 *Develop-*

*ment and Field Test of Psychophysical Field Tests for DWI Arrest, 16–17* (1981), which is reprinted in Nichols, *or cit.*, beginning at p. 3 of Appendix C to Chapter 26. It is interesting that the explanation seems to assume that the presence of HGN in alcohol-free persons is due solely to the influence of drugs. If more than half of the population will exhibit HGN at zero BAC, this assumption may be subject to reasonable questioning.

The opinion asserts that the Court is taking judicial notice of scientific facts which are capable of accurate and ready determination by resorting to sources whose accuracy cannot be reasonably questioned. 880 S.W.2d at 764. This statement may be true if it is limited to the conclusion that ingestion of alcohol has a cognizable effect on the human eye. But the conclusion that an officer in the field can, by administering the HGN test on the highway under non-laboratory conditions, determine whether a person is intoxicated has been seriously questioned. The NHTSA's findings, in fact, are not in agreement with those of other researchers, e.g., Ashcan, *Different Types of Alcohol Nystagmus,* 140 ACTA LARYNOLOGI-CA, 69 (1957).

Although the Court found that the HGN test is a reliable indicator of intoxication, it rejected NHTSA's contention that the test was a reliable indicator of a precise BAC (specifically, a BAC of at least .10). 880 S.W.2d at 769. The Court refused to recognize the test as a reliable indicator of a BAC of at least .10 because NHTSA's "lab experiment [showed] a margin of error of .03% and [because of] the dearth of published writing on NHTSA's formula and technique." (No mention was made of published criticisms, already noted in this opinion, of NHTSA's methodology and conclusions.) These factors prevented the Court from taking judicial notice of the reliability of the HGN test "within the context of determining precise BAC based on the angle of onset of nystagmus." 880 S.W.2d at 769.

The inclusion of the HGN test in the battery of roadside sobriety tests is interesting. Unlike other standard subjective field sobriety tests, such as the one-leg stand test and walk-and-turn test, it is not designed to reveal the loss of normal voluntary control of a person's mental or physical faculties by observation only. It appears to be in the same category as bloodshot eyes, although it comes clothed in more scientific garb.

*Emerson* is an authoritative recognition by our highest criminal appellate court of a court's right to consult scientific literature in considering the admissibility of scientific evidence. Although the opinion involved the consideration of scientific literature for the purpose of determining that evidence was properly admitted, there is nothing in the opinion which suggests that the judicial research is limited to consideration of literature which results in the affirmance of a conviction.

In evaluating the testimony, I will attempt to follow the *Kelly* guidelines by considering whether the evidence discloses the existence of valid scientific theory which forms the basis for the testimony; whether the record reveals the existence of a valid technique for the application of such valid theory; and whether McDougall properly admitted such valid technique in this case. I will, as did the *Emerson* court, refer to relevant scientific literature.

C. *Evidence of valid scientific theory.*

McDougall said that, given the result of appellant's breath test, he could, by extrapolation, testify concerning appellant's BAC at the time he was arrested two hours and nine minutes prior to the test. His first explanation was neither lengthy nor clear. He said:

> I assume certain variables. And I cannot give you a specific number for a previous period in time because there are several probabilities. So, using the possibility that he was a higher [BAC] at the time of arrest, and what the highest

would have been, and if we know what it was at the time of test, what it could have dropped to or could it have been higher and still have enough time to arrive at the concentration of what we see on the test record, if he was rising at the time of the test. And between these two, somewhere, is where the actual value will lie.

This explanation is repeated here because, in addition to revealing that in his extrapolation it was necessary that he "assume certain variables," it shows that, as far as the possible BAC was concerned, McDougall considered only two possibilities. The first possibility he considered is that the BAC at the time of arrest was higher than the BAC revealed by the subsequent test. (His consideration of this possibility is not easily understood in the face of his testimony that if a person "blows" a .19 two hours after his arrest this would tell him that the person's BAC at the time of the test was higher than it was at the time of the arrest.) The second possibility, though less clearly enunciated, is the situation where the BAC revealed by the test was higher than the BAC at the time of arrest. He did not explain why he dismissed the possibility that the BAC at the time of arrest was the same as the BAC revealed by the breath test. Recognition of this third possibility does not rest on the assumption that a person's BAC does not change with the passage of time. The record and literature establish that the BAC of a person who has consumed alcohol will rise until it reaches a peak and then will decline until all alcohol has been eliminated from the blood. This means that a BAC of, say, .14, which is reached prior to peak, will necessarily be repeated as the BAC declines after peak. This will be revealed by the study of any graph showing absorption and elimination of alcohol.

The nature of the process followed by McDougall is better explained by his subsequent testimony when he used numbers to illustrate the "range" within which he insisted appellant's BAC at the time of arrest would be found. This explanation which has been previously quoted in this opinion, was given when he was asked if he could give a "range" for the BAC at the time of arrest for a person whose BAC two hours after his arrest was revealed by a breath test to be .19. He answered that he thought it was "possible" for that person to be as much as .06 less than a .19 at the time of his arrest, so that his BAC at time of arrest would be "as low as a .12 or .13 ... A .12 or .13 at the low end and somewhere about a .25 at the high end, somewhere in between there." (There can be no doubt that this testimony concerned appellant's BAC at the time he was arrested.)

What McDougall was doing is clear. He was attempting to use appellant's BAC of .19 revealed by the breath test as the basis for inferring appellant's BAC at the time of his arrest more than two hours earlier. Since he did not consider the possibility that the BAC at the time of the test was the same as at the time of the test, he realized that, in order to infer the BAC at the time of the arrest from the BAC revealed by the subsequent breath test, it was necessary to make some adjustment to the breath test BAC to account for whatever changes occurred in appellant's BAC because of the passage of time.

I will assume that retrograde extrapolation is based on a valid scientific theory and pass to the question concerning the facts which must be known and used in making the necessary adjustment to the subsequent test BAC. This, I think, leads to consideration of the existence of a valid technique which must be used in applying the presumably valid scientific theory and, finally, requires that a determination be made as to whether that valid technique was correctly applied by McDougall in this case.

### D.  Valid technique.

In any DWI prosecution, the critical question is the condition of the accused at

the time he was operating a motor vehicle on a public highway. Where the charge is that the defendant was operating a motor vehicle on a public highway at a time when his BAC was .10 or more, the State must prove that the BAC of the accused at the time of the alleged offense was at least .10.

McDougall's testimony and relevant literature show that when alcohol is consumed it is absorbed into the bloodstream, and the drinker's BAC will rise steadily until a peak BAC is reached, after which the BAC will decline until all alcohol is eliminated from the blood. This means that the passage of time will result in a constant change in the drinker's BAC.

If the driver's BAC peaked at or before the time of his arrest, his BAC was declining during the entire time intervening between his arrest and the test. Therefore, the BAC at the time of the arrest can be inferred only by adding to the BAC revealed by the test the amount the BAC decreased. If the driver peaked at or after the time of the test, the BAC at the time of arrest can be determined only by subtracting from the test BAC the amount the driver's BAC increased between the time of his arrest and the time of the subsequent test. If the peak occurred after the time of arrest but before the time of the test, the test BAC must be adjusted to account for the increase in BAC between the time of arrest and the time of peak and the decrease occurring between the time of peak and the time of the test.

No reliable method of retrograde extrapolation has been referenced which does not require that the adjustments outlined in the preceding paragraph be made to the BAC revealed by the breath test. My attention has not been called to any study showing, or even suggesting, that a reliable technique for inferring a person's pre-test BAC exists which does not require making such adjustments. I have found none.

### E.  *Technique Used by McDougall*

After saying that he could not give appellant's time-of-arrest BAC in terms of a specific number, McDougall asserted that he could give a "range" consisting of a low end and a high end, and that appellant's BAC when arrested would lie within that range. He declared that it was "possible" that appellant's BAC when arrested two hours and ten minutes before the test could be "as much as .06 lower than the .19 revealed by the breath test." He said that at the time of arrest appellant's BAC was within a range having .12 or .13 as its low end and a high end of "about .25."

In arriving at his low end, or possible low ends, McDougall assumed that appellant peaked at or after the time of the test, and the amount which he subtracted from .19 clearly represents the amount of alcohol appellant's blood had absorbed during the entire period of two hours and ten minutes which intervened between arrest and test. When he subtracted .06 from .19 to get the low end of .13, he must have been assuming that appellant was absorbing alcohol at the rate of less than .03 an hour. As far as his other low end of .12 is concerned, it can be explained only as the result of subtracting .07 from .19, so that the possible low end of .12 was obviously based on the assumption that appellant was absorbing alcohol at the rate of more than .03 per hour.

McDougall's high end of about .25 can be explained only by the fact that he added "about" .06 to the test BAC of .19. Since his high must rest on the assumption that the test BAC of .19 was lower than the BAC at the time of arrest, the "about" .06 which he added to .19 must represent the total amount of alcohol appellant eliminated between the time of arrest and the time of test. This means that in determining his high end, McDougall had to assume that appellant was eliminating alcohol at a rate of about .03, not .02, per hour.

At the time of the trial, when asked to name the factors he considered in determining the low and high ends of his range,

McDougall said he took into account (1) the amount of time that has passed [presumably, he meant the amount of time that had passed between the time of the arrest and the time of the test]; (2) how much alcohol it takes to get to that alcohol concentration; (3) the rate at which alcohol is eliminated from the body; and (4) "what [he] would consider normal absorption of alcohol, how fast a person normally drinks."

Shortly after he gave this answer, McDougall was asked if he could give a range for a "male's BAC" at the time he was "stopped" if a test given two hours later revealed a BAC of .193. [The record compels the conclusion that the question concerned appellant's BAC at the time he was stopped. Although the record shows that some time elapsed between the "stop" and the arrest while the arresting officer was having appellant perform several roadside tests, appellant does not here contend that such elapsed time was significant.] McDougall answered:

> I believe the high side would have been somewhere around a .04 higher than that, which would be a 0.23 and then his body would have eliminated the equivalent of two drinks an hour during the two hours. On the low side, his body would have absorbed two or three drinks and as much as a .04 or a .06, reached a peak and either maintained that peak level or decreased a little bit until the time of arrest, which would make him, I guess at the low side of a .13. So I would say between a .13 and a .23.

Although he admitted that an expert using retrograde extrapolation must make certain assumptions, McDougall declared that he could confidently infer appellant's BAC at the time of arrest because he had two "knowns." McDougall identified these "knowns" as appellant's BAC revealed by the breath test and "the standard elimination rate which is pretty standard among all persons." Because of this knowledge,

McDougall said, he can calculate the range "in theory."

### F. Did McDougall Correctly Apply the Valid Technique?

Under *Kelly*, scientific evidence is admissible only if it is "sufficiently relevant and reliable to help the jury in reaching accurate results." 824 S.W.2d at 572. Such evidence is reliable only if both the scientific theory and the technique for applying it are both valid and the valid technique has been properly applied in the case before the court. *Id.* at 573.

Where a defendant is charged with operating a motor vehicle on a public highway at a time when his BAC was .10 or more, the only relevant evidence is that which tends to prove that particular defendant had a BAC in excess of .10 when he was driving on a public highway. If the evidence concerning BAC does not tend to show that fact, it is irrelevant and inadmissible because it can be of no help to the jury in reaching a correct answer concerning that defendant's guilt.

I have assumed the existence of a valid scientific theory and of a valid technique for applying that theory. I now consider whether, in the case now before us, McDougall correctly applied that valid technique.

I will first examine the extrapolation McDougall spoke of during the hearing on the motion to suppress (extrapolation 1) and the one he testified to during the trial on the merits (extrapolation 2).

In arriving at his low end of ".12 or .13" in extrapolation 1, McDougall assumed, as far as the .12 is concerned, an absorption rate of more than .03 per hour [.07 over a period of two hours and ten minutes] or, as far as the low of .13 is concerned, an absorption rate less than .03 per hour [.06 over a period of two hours and ten minutes]. In extrapolation 2, for his low end of .13, McDougall assumed that appellant "could have absorbed two or three drinks and as much as a .04 or a .06, which would

make him [he guessed] at the low side of a .13." In effect, McDougall assumed, in determining his low end in extrapolation 2, that appellant had absorbed alcohol at a rate of .02 or .03 over a two hour period, although he only used .03 in determining his low end. Concerning appellant's high end of about .25 in extrapolation 1, McDougall assumed that appellant had eliminated "about" .06 during the intervening period of 130 minutes, which would result in an elimination rate of "about" not quite .03 per hour. In extrapolation 2, McDougall assumed that appellant was eliminating at a rate of .02 per hour, since he added .04 to .19 to make the adjustment he thought necessary to account for elimination during two hours. This is how McDougall arrived at his high end of .23 in extrapolation 2. He did not explain why he used an elimination rate of almost .03 in extrapolation 1 and an elimination rate of .02 in extrapolation 2, although it must be admitted that the use of different elimination rates is entirely consistent with his admission that he might have been relying on different assumptions in the two extrapolations and that the figures "are not set in concrete."

In reciting the factors he would "take into account" in determining the high and low ends of his range, McDougall enumerated "how much alcohol it takes to get to that alcohol concentration" and "how fast a person normally drinks." Neither one of these factors was mentioned in either extrapolation, and the record furnishes no basis for finding that he considered either one of these factors in arriving at his low and high ends. The fact that McDougall did not consider all of the factors which he said were relevant may justifiably be considered significant. While drawing, for the benefit of the jury, a graph showing "alcohol concentration versus time," he said that the low end would be determined by considering that the person in question could be eliminating "at a .02 or .03 elimination rate per hour, [which] would make it a .06 less than [.19]—a .13." The undisputed testimony in this case, except for

this instance, establishes that in arriving at the low end of a range the test BAC is decreased by subtracting the amount absorbed during the time between arrest and test, not by subtracting the amount eliminated, which is relevant only in considering the possible high end of the range. Must we assume that McDougall's reference to rate of elimination instead of rate of absorption was merely a slip of the tongue?

During his voir dire examination, while answering hypothetical questions based on the assumption that the person in question was eliminating at a rate of .02 per hour, McDougall said, "He could have stopped drinking the day before and been at a....40 [BAC] and maybe coming down to a .08 24 hours later, or something of that nature, because he is eliminating at a constant rate." If the hypothetical person's "constant rate" of elimination was, in fact, McDougall's "standard" elimination rate of .02 per hour, he would have eliminated .40 in 20 hours [20. $\times$ .02], so that his BAC 20 hours after he stopped drinking would have been zero. McDougall did not explain how the person could have attained a BAC of .08 four hours after his BAC was zero. The person could not have absorbed .08, which, according to McDougall, is the equivalent of four drinks, four hours after having zero BAC, since he had stopped drinking 24 hours earlier. Perhaps a fairer explanation of the testimony is that, since the person had come down .32 [.40 minus .08 = .32] in 24 hours, McDougall was assuming an elimination rate of about .013, rather than his standard .02 which he used in extrapolation 2 or the almost .03 which he used in extrapolation 1.

The record before us makes inescapable the conclusion that, like all experts, McDougall made certain assumptions. When he said that in the process of extrapolating he would "assume" certain "variables," he did not mean that he would assume that certain "variables" existed. What he meant was that he would assume

that there are no variables from individual to individual. McDougall assumed that there are certain rates or values which are applicable to all of what he described as the five billion individuals in the world, although he did admit there might be some exceptions.

McDougall assumed that all persons absorb alcohol at the same rate, although he did not always assume the same rate. In his first extrapolation he assumed an absorption rate of less than .03 in determining the low end of .13, and a rate of more than .03, which he apparently used in determining the low rate of .12. In his second extrapolation he spoke of an absorption rate of .02 or .03 per hour, although in his calculation he apparently used only an absorption rate of .03 per hour.

Whichever of the different absorption rates he used, McDougall's assumption that that rate is applicable to all persons cannot be defended. Neither his testimony nor the State's brief refers to any scientific literature supporting the theory that all persons absorb alcohol at the same rate. I have found no such authority.

The Manual of which McDougall was a co-author recognizes, at page 5–5, that rates of absorption vary from person to person. Of the various factors which influence absorption, the Manual lists only 1) the type of alcoholic beverage consumed (carbonated beverages tend to promote absorption, while oily or fatty beverages tend to retard it); 2) the concentration of alcohol in the beverage consumed (if the concentration of alcohol in the stomach becomes too high, the stomach may become irritated, reducing the amount of alcohol which passes from the stomach to the small intestine, necessarily delaying the rate at which the blood absorbs alcohol); 3) altitude (it has been contended that alcohol is absorbed more rapidly at higher altitudes, although later studies cast some doubt on this contention); 4) the functioning of pyloric sphincter, which controls the passage of the stomach's contents into the small intestine, from which site by far the greatest amount of alcohol passes into the blood; and 5) the quantity and type of food eaten before or while drinking (the presence of food in the stomach slows the rate of absorption, since alcohol does not pass from the stomach into the small intestine until all the food in the stomach has been digested.

McDougall did not know what type of alcoholic beverage appellant had consumed. He was ignorant concerning the concentration of alcohol in the unknown beverage which appellant had been drinking. There is no evidence that he had any knowledge concerning the functioning of appellant's pyloric sphincter. McDougall did not know whether appellant had, or had not, eaten anything before or while drinking. Even if we assume that McDougall knew, or might easily have determined, the altitude of Bexar County, he was completely ignorant, as far as appellant was concerned, of four or the five factors which, according to the Manual, affect the rate of absorption.

In 2 Nichols, DRINKING/DRIVING LITIGATION, CIVIL AND CRIMINAL, Secs. 23:07–23:27, pp. 38–102 (1995), there is a discussion of factors affecting the rate of absorption, supported by reference to numerous scientific articles dealing with the subject. There can be no doubt that the amount of alcohol absorbed, the rate of absorption, peak absorption, and the time to reach peak absorption depend upon a variety of factors, not limited to the five which are listed in the Manual. In addition to those five factors, consideration must be given to, among other things, the time frame during which the alcohol was consumed; biological factors such as the race, age, and sex of the person drinking, all of which can affect the rate of absorption; the effect of food must be considered not only in terms of the amount and type of food consumed, but also in terms of the interval between eating and drinking; and emotions and certain diseases which may affect the rate of gastric emptying, which will necessarily affect the rate of absorp-

tion. McDougall supposedly did know that appellant was a Hispanic male.

Section 23:30 of the Nichols work cited in the preceding paragraph discusses the fact that absorption rates are not the same for the same individual when he is tested at different times. It is also pointed out that, depending on the various factors which may affect gastric emptying, not only among different persons, but also in the same individual, complete absorption may require from two to six hours.

There is nothing in the record to indicate that McDougall considered, as far as appellant is concerned, the many factors, other than sex, which may affect the rate of absorption. This means that in his extrapolation he did not apply relevant facts. Stated differently, as far as rate of absorption is concerned, McDougall's extrapolation was not based on knowledge of relevant facts. I am not prepared to hold that an expert, even a forensic expert, can arbitrarily pick a rate of absorption, whether it be less ore more than .03, and assume that his chosen rate applies to all persons in the world, including the person who happens to be charged with DWI in the case in which the expert is testifying.

I next consider the rate of elimination which McDougall obviously assumed applied to all persons in the world, including appellant. In extrapolation 1, he used an elimination rate of almost .03 per hour. In extrapolation 2, he used a rate of .02 per hour. In his testimony concerning the hypothetical person whose BAC dropped from .40 to .08 in 24 hours, he apparently used an elimination rate of significantly less than .02, or if he used .02, he made an error in his mathematics, despite the fact that, as we shall see in the next paragraph, the Manual apparently considers .02 useful only "for ease in calculation."

Contrary to McDougall's assumption that all persons eliminate alcohol at the same rate, the Manual, at page 5–9, points

out that elimination rates vary from individual to individual, ranging from .01 per hour to .025 per hour, with the average being .018 per hour, although a rate of .02 per hour may be used for "ease of calculation." Nothing in the Manual suggests that using the wrong average makes for greater accuracy.

Rate of elimination is, like rate of absorption, a variable value. See Nichols, *op. cit.*, secs. 23:27 *et seq.*, for an enumeration of the various factors which affect elimination. A helpful summary of these factors, as well as those which influence absorption, is found in Sec. 23:60 of the Nichols work.

By far the greatest amount (about 90%) of alcohol is eliminated as a result of the process of metabolism which takes place in the liver. It should be obvious that any person, even an expert, who is performing any function which requires knowledge of the rate at which a person eliminates alcohol, would be vitally concerned with the size and functioning of that person's liver. McDougall's testimony contains no mention of the liver other than his statement that when alcohol is absorbed by the blood it passes first to the liver, where the process of elimination begins.

McDougall's assumptions that all persons absorb alcohol at the same rate is, itself, based on an unexpressed assumption that every person's stomach is "normal" in the sense that it is of normal size and functions "normally." Without this assumption, there is no basis for assuming that a rate of absorption is applicable to all persons.

The rate of absorption is dependent on the amount of food in the stomach and the time it takes to digest it. McDougall at least partially recognized this when he said, in support of his assertion that no person can be in the absorption stage for as long as two hours, "It doesn't take two hours to digest meat and potatoes."[6] [His

---

**6.** At this point, for some unexplained reason, McDougall switched from talking about the

time to reach peak to the time required for the complete digestion of meat and potatoes

testimony that all alcohol must be absorbed in not more than ninety minutes after his last drink will be discussed later.] Once it is recognized that individual differences are important when the rise and fall of BAC are concerned, no conclusions concerning any person's rate of absorption or rate of elimination can be drawn without knowledge of that person's physiological functions. Since McDougall lacked this knowledge concerning appellant, it was necessary that he rely on a value which he assumed is applicable to all persons in the world, including appellant.

In terms of human physiology, "normal" embraces a wide variety of individual differences, and there is no basis for assuming that "normal" means "the same." If we could look at our own stomachs, probably most of us would expect to see what might be called the typical textbook stomach. In fact, as Dr. Roger Williams, has pointed out, "Stomachs vary ... in size, shape, placement and contour far more than our noses and mouths." R. Williams, YOU ARE EXTRAORDINARY, 24 (1971). More importantly, since the inlets and outlets vary greatly in size, shape, placement and operation, "some stomachs empty rapidly into the small intestine, others much more slowly." *Id.* at 25. According to one author referred to by Williams, there are nine different "normal" stomachs and nineteen different "normal" stomach types which vary greatly in size and shape. Given these facts, no one should have difficulty in understanding why there is not a high degree of uniformity in what takes place in the stomach. One study showed that among some 5,000 people, the gastric juices varied in their pepsin (the primary digestive enzyme) content at least a thousandfold. Similar variations were found in the hydrochloric acid content, with a substantial number of persons having no acid in their gastric juices. "If normal facial features varied as much

as gastric juices do, some of our noses would be about the size of navy beans, while others would be the size of twenty pound watermelons." *Id.* If McDougall knew any of these facts, he obviously ignored them in favor of his assumption that all persons absorb alcohol at the same rate.

As previously noted, while McDougall admitted that an expert using retrograde extrapolation must make certain assumptions, he declared that he could testify concerning appellant's BAC at the time of arrest because he had two "knowns," which he identified as the result of the breath test and the standard elimination rate [.02 per hour] "which is pretty standard among all persons." Because he knew these two things, McDougall said he could calculate appellant's BAC at the time of arrest "in theory." Actually, McDougall knew only one thing about appellant, and that was the result of the breath test. He was ignorant of the rate at which appellant eliminated alcohol and assumed, as distinguished from knowing, that appellant eliminated alcohol at the rate of .02 per hour. What McDougall described as two knowns are, as far as appellant is concerned, one "known" and one assumption. Assumptions, of course, are necessary only when there is ignorance concerning a relevant factor. It is this lack of knowledge which, as McDougall testified, makes it necessary for all experts to indulge assumptions when they attempt retrograde extrapolations. I am not prepared to believe that McDougall, or any other expert, not having the result of a breath test (including a case in which no breath test was administered), would use the "standard" breath test result in Bexar County for the purpose of predicting a defendant's BAC at a prior time, even in terms of a "range."

Moreover, even if his knowledge of what he calls a "standard rate of elimination" is

---

in the stomach. Of course, since absorption does not begin until all food in the stomach has been digested and passes into the small intestine, there is no defensible reason for

supposing that peak absorption will be reached at the same time that absorption begins.

accepted as a relevant "known," this does not solve his problem. The rate of elimination becomes relevant only if it is assumed that appellant peaked at or before the time he was arrested, and even if that assumption is indulged, the rate of elimination is used only for the purpose of determining the "high end" of the expert's range. A "range" as far as here relevant, requires a high end and a low end. Knowledge which is limited in use only to determine one end, the high end, is useless for the purpose of determining a "two-end" range.

In reality, as opposed to "in theory," McDougall's ability to calculate appellant's BAC at the time of arrest would require, in addition to the two factors which he called "knowns," a further assumption. If appellant peaked at any time after his arrest, and if McDougall is limited to giving a "range," since he confessed inability to give a prior BAC in terms of a "specific number," calculation of the low end of any expert's range would require knowledge of the rate of absorption. Two "knowns" are simply not enough.

After saying that in making his calculation he could not "factor in" any "of these variables" of which he had no knowledge, such as the many things he admitted not knowing about appellant, McDougall asserted that he could state the "parameters" which he used in giving his "hypothetical" answers, and that appellant's counsel could "live with that" or could illustrate the limits of those parameters. McDougall said he based his parameters on some "hypothetical" individual, on a "normal drinking individual." This statement was made right after he had identified appellant's "drinking habits" as one of the "variables" which he did not know and, therefore, could not "factor in."

The frequent use of "normal" by McDougall may be cited as some evidence which supports the suggestion that, instead of arbitrarily choosing certain rates of absorption and elimination, he was using average rates, although he changed the number from time to time. In any event, his testimony is insufficient to show that use of average rates establishes that he correctly applied a valid technique in performing his extrapolations.

It is true that results of laboratory tests and clinical studies often refer to "average rates," "average times," "average diets," and similar terms which serve a useful purpose in enabling us to understand the results of clinical or laboratory tests which are often stated in technical language. But this does not justify, or even permit, the conclusion that average values or characteristics can be assumed to be applicable to all individuals. Averages cannot be relied on even as being applicable to all members, or even to one member, of the group studied or tested. Necessarily, an average value or characteristic cannot, simply because it is average, be applied to any chance individual who happens to be involved in litigation.

If a study of a representative group of Texas lawyers reveals that the average height of the individuals studied is six feet, two inches, no reasonable person would conclude that every lawyer in Texas is six feet and two inches tall. "Average" refers to the value obtained by dividing the sum of a set of quantities by the number of quantities in the set. Thus, the term implies diversity. A person chosen at random may, or may not, conform to the average value. In fact, there is no basis for even assuming that it is more likely than not that the average applies to that specific person. *See, generally,* D. Huff, HOW TO LIVE WITH STATISTICS, Ch. 2 (1982).

Some simple illustrations should be sufficient to show the fallacy in the technique which McDougall applied in this case, even if it is assumed that he was using average rates of absorption and elimination.

The October, 1998, issue of National Geographic Magazine contains a supplement entitled, "Millennium Supplement: Population," which refers to the fact that

the average fertility rate of women in developing countries is declining, as shown by the fact that the average number of children per woman has dropped from 6 in 1950 to 3.3 in 1998. In actual fact, it would be impossible to find a woman in any country who has given birth to 3.3 children. No one would assume that all women in developing countries gave birth to 3.3 children in 1998.

The January 20, 1999, New York Times gives the high temperature reported for the preceding day by each of 68 foreign cities. Adding together the reported high temperature for every other city on the list and dividing the total by 34, gives an average high temperature of 56.6. Not one of the 34 cities reported a high temperature of 56.6. If the average is rounded off to 57, not one of the cities reported a high of 57. Twenty cities reported a high below 57 and 14 reported a high above 57. Only 6 cities had a high found in a range having 62 as its high end and 52 as its low end, while only 13 of the 34 cities reported highs within a range having 77 as its high end and 47 as its low end. Any conclusion based on the assumption that 34 cities had reported a high of 56.6 or 57 would be indefensible.

But it is not necessary to rely on magazine and newspaper articles to show the unreliability of McDougall's technique. The flaw in his reasoning is found in his own testimony in this case.

McDougall testified that appellant had 14 "drinks" in his system at the time he was arrested. He described a "drink" as being "12 ounces of beer or four to five ounces of wine or an ounce and a quarter of 80 proof liquor." He explained his conclusion by saying that if a person weighing approximately 185 pounds "blows" a .193 BAC two hours after he has stopped drinking, this means that at the time of the breath test he has in his system the "equivalent of 12 drinks." Nowhere did he explain the basis for this conclusion other than to say that he used his own "shorthand." He said that if the person is in the elimination stage at the time of the breath test, this means that he had more drinks than 12, because he would have eliminated two drinks during that two-hour period. He added, "A person, in any case, whether they were coming down or going up, they still would have consumed ... at least 14 drinks." [This testimony is somewhat strange]. If by "coming down" he meant the person was eliminating alcohol from his body and by "going up" he meant the person was still absorbing alcohol into his bloodstream, his conclusion is patently false. If he was "going up" at the time of the test there is no reason for adding two drinks, since the addition of two drinks is justified only if it is assumed he was eliminating at the time of the test. If McDougall's unexplained "shorthand" is based on the assumption that it matters not whether the person is absorbing or eliminating alcohol, it is unquestionably wrong.

The first obvious objection to this calculation is that it considers the time of peak completely irrelevant, since it does not affect the result. What would appear to be the only defensible reason for adding two drinks to the 12 supposedly revealed by McDougall's shorthand would rest on the unwarranted, or, at least, unexplained, assumption that the person peaked at or before the time he was arrested. This assumption becomes even less tenable in view of McDougall's earlier testimony that if a person blows a .19 two hours after his arrest, this indicates his BAC at the time of the test was higher than at the time of arrest.

The more serious error in McDougall's calculation did not become evident until he was cross-examined. The portion of his testimony that is most interesting and revealing with respect to the fallacy necessarily inherent in assuming that an average applies to all persons is revealed by his statement that in reaching his conclusion he "was assuming Widmark's Rho factor of .68."

The reference is to a study by the Swedish scientist, E.P.M. Widmark, who studied the physiology of alcohol consumption and published his findings, in German, in 1932. His study defined the absorption, distribution and elimination of alcohol in mathematical terms which he then used to calculate the amount of alcohol in a person's body. His test involved 20 men and 10 women each of whom consumed fixed amounts of diluted cognac or brandy on an empty stomach. He then tested blood samples from each person every fifteen minutes for a period of three hours and plotted the resulting BAC for each person in blood alcohol curves. He found that each person's BAC increased rapidly and then decreased. He termed the downward slope of the curve "Beta," a term which is still used today to describe the rate at which alcohol is eliminated from the blood. The rate of decline of BAC and the peak BAC levels resulting from drinking the same amount of alcohol on an empty stomach varied greatly among the 30 person being tested. (Subsequent studies have established that peak BAC levels vary substantially among individuals even when the amount of alcohol consumed per body weight and the factors affecting the rate of absorption and elimination are controlled. 1 O'Neill, Williams, and Duboski, *Variability in Blood Alcohol Concentration: Applications for Estimating Individual Results*, 4 J. Stud. On Alcohol 22 (1983)).

Widmark also determined the Rho factor, which is the ratio of the concentration of alcohol in the entire system to the concentration of alcohol in the blood; that is, the percentage of alcohol in the entire body compared to the percentage of alcohol in the blood. He used the terms Beta (rate of elimination of alcohol) and Rho to develop formulas for calculating the total amount of alcohol eliminated from the body and to calculate the amount of alcohol in a person's body that would produce a given BAC. No useful purpose would be served by describing the formulas developed by Widmark, since McDougall used his own unexplained shorthand instead of

the Widmark formulas and from all of Widmark's conclusions he chose to use only the "Rho factor of .68." For example, the Widmark formula required that a person's weight be expressed in ounces by multiplying the weight in pounds by 16. McDougall explained that by using his formula he did not have to do this. He also testified that in order to determine the number of drinks a person had consumed he did not have to determine the amount of alcohol in the person's body, a determination which results from the use of the Widmark formula, because, to use his own words, "The shorthand that I am using already accounts for that." He added that he has developed "some shorthand methods that account for all the figures in the long [Widmark] equation ..." There is no evidence that any person other than McDougall uses his shorthand methods.

His testimony establishes that his reliance on Widmark's study, is limited to "assuming Widmark's Rho factor of .68." But he failed to mention a few important factors relating to his assumption. He did not mention that the "Rho factor of .68" is the average Rho factor reported by Widmark. He also forgot to mention two other things, if, in fact, he knew them. In his report, Widmark pointed out that there was a significant variation in the Rho values of the individuals tested. There is, therefore, no basis for assuming that "Widmark's Rho factor of .68" is applicable to all persons, including appellant unless it is assumed that average values are applicable to every individual. In addition to the fallacy resulting from the assumption that the average Rho value found by Widmark as the result of testing thirty Swedes in Sweden applies to appellant Mata in Bexar County, it must be pointed out that Widmark's "Rho factor of .68" was obtained by testing only persons who consumed alcohol on an empty stomach. Although McDougall had noted that eating before or while drinking affects a person's rate of absorption, he apparently was happy to apply the average to all persons,

including appellant, without bothering to find out whether appellant's stomach was empty or full before or during the time he was drinking. But McDougall's silence concerning Widmark's Rho factor of .68 failed to reveal perhaps the most significant factor. He chose to ignore the fact that of the 30 persons tested by Widmark, 19 had a Rho below 65, 8 had a Rho above .70, and only 3 had a Rho between .65 and .70.[7] Perhaps he did not know this. The average Rho of .68, which McDougall said he used in his secret shorthand, therefore, was descriptive of, at most, 10% of the persons tested. To employ, as he did, a value descriptive of not more than one-tenth of the test sample to all the people in the world and, specifically, to appellant, is completely unreliable, and the conclusions reached are unacceptable. Actually, the arbitrary use of Widmark's averages in making all calculations would yield results which would be correct for fewer than 8 persons out of a hundred.[8]

According to the Manual, the average elimination rate is .018 per hour. Since two hours and ten minutes elapsed between appellant's arrest and the breath test, the use of this average would require that McDougall add about .039 to the .19 revealed by the test. If he did this, the high end of his range would be about .229, not about .25 as he testified. If he used Widmark's Beta, or average elimination rate, of .015 per hour, he would have added about .035 to .19, giving him a high end of about .225, not, as he testified, about .25.

McDougall spoke of what he described as a "standard" elimination rate of .02. Even if we equate "standard" with "average," it is clear he did not use this rate consistently. If he had used his "standard" rate, he would have added about .043 to .19, giving him a high end of about .233, not about .25.

Obviously, McDougall did not use appellant's absorption and elimination rates because he did not know them. He testified that his testimony was based on what is "normal," and that his range was based on a "hypothetical" average, on what he would consider "normal drinking behavior." Nowhere did he claim that his testimony was based on what scientific studies reported to be normal drinking behavior. Unlike the statement in the Manual and in reports of studies, he did not speak of average elimination rates revealed by those studies, but only of a hypothetical average based on what he considered to be normal drinking behavior which he arbitrarily assumed corresponded to appellant's actual drinking behavior.

It is interesting that during the trial on the merits he testified to a range having a high end of .23 and a low end of .13, not a low end of .12 or .13 and a high end of about .25. He added only .04 (two hours of elimination at .02 per hour) to .19. Clearly, his assumptions underlying his trial testimony were different from the assumptions on which he based his testimony at the motion to suppress.

Some other declarations by McDougall merit consideration.

After agreeing that "the situation changes" if the peak occurs after the test because in that case there would be a different rate of absorption depending "upon the circumstances of the individual and the amount of alcohol and what that person has had to drink, and, perhaps, their weight and when they started drinking and when they stopped drinking." He

---

7. The details concerning Widmark's study are taken, from the most part, from 3 Nichols, DRINKING/DRIVING LITIGATION, Secs. 36.06–36.10 (1996). Widmark's study was published in German in 1932. A computer-generated English translation which appeared in 1981 is apparently out of print. In any event, it is no longer available.

8. The observation is taken from Nichols, *op. cit.*, Sec. 23.30, p. 112, and is supported by citation of Simpson, *Medicolegal Alcohol Determination: Widmark Revisited.* 34 Clin. Chem. 889 (1981).

agreed that all of these things would create a different rate of absorption.

It should not be overlooked that the things he mentioned that would create a "different rate of absorption" correspond almost exactly to the "circumstances" relating to appellant of which he was ignorant. There is no explanation of the fact that if the peak occurred after the test, the rate of absorption, which apparently remained constant during the two hours and ten minutes before the test, suddenly began fluctuating so widely that it would be impossible to determine the rate of absorption if the peak occurred one minute after the test. Of course, if the peak occurred after the test, it could not be assumed that appellant had eliminated alcohol between the time of arrest and the time of test, since, necessarily he would not have been eliminating alcohol for the two hours and ten minutes intervening between the arrest and the test. This would mean there could be no "high end" and therefore, no "range."

McDougall avoided these insurmountable difficulties by completely eliminating the possibility that appellant had peaked after the breath test by declaring that no person could still be absorbing alcohol two hours after his last drink. He did not know of "any situation where a person would be in the absorption stage after an hour." If a person drank just before he was arrested, his BAC would be rising for an hour and then he would peak. He knows of "no situation where a person would peak after two hours." If a person drinks after having a meal of meat and potatoes, he would peak "somewhere around an hour to an hour-and-a-half, at the very most." "He has to peak in about an hour." He added, "Potatoes do not dilute the alcohol any more than potatoes [sic] can dilute the alcohol [sic]." He has tested thousands of persons [first- and second-year college students] and in his experience, "with all the studies [he has] read, it is between "60 minutes to 90 minutes to reach a peak after drinking on a full or empty stomach."

In considering McDougall's statements about the maximum time any person can remain in the absorption stage, I will overlook the fact that he was not consistent concerning the time during which a person could be in the absorption phase after the last drink. A person's BAC would continue to rise for an hour after the last drink and then peak. If a person drank on an empty stomach he would peak in 30–45 minutes. If he ate meat and potatoes before drinking, he would peak within 60–90 minutes at the very most. He has to peak in about an hour. It takes between a half-hour to an hour-and-a-half to reach a peak on a full or empty stomach. If his statements about the time it takes to peak are true, he has created an interesting situation, even if we ignore the fact that he doesn't know when appellant had his last drink. Assuming that he had his last drink just before he was arrested, appellant must have peaked 90 minutes after the arrest at the latest. So when McDougall determined appellant's low end by assuming that appellant had been absorbing alcohol for two hours and ten minutes after his arrest, he was assuming the existence of what was, according to his testimony, a situation which could not possibly exist. If McDougall is right, appellant would have necessarily peaked, at the latest, 40 minutes before the test. He had to be eliminating for forty minutes before the test, at the very most. McDougall's calculation based on no elimination before the test would have no basis in fact. Appellant would have been absorbing liquor for, at the very most, 90 minutes after the arrest, and eliminating for only the remaining forty minutes before the test. There is no way the low end of McDougall's range could be accurate, since it is based on impossible facts. The same is true of the high end. If appellant drank on an empty stomach, he would have peaked, at the very latest 45 minutes after he was arrested, or 85 minutes before the test. He would no longer be absorbing at the time

of the test because he had peaked 85 minutes before. He would not have been eliminating for 130 minutes at the time of the test, because he would have been absorbing for 85 minutes after his arrest. It is true, of course, his extrapolation would not be harmful to appellant, since by subtracting 230 minutes of absorption time from .19, he came up with a lower figure than would have been the case if he based the calculation of his low end on the basis of a shorter period of absorption between arrest and test. But, necessarily, the high end would have been lower than the figure, whether "about .25" or .23, because either figure resulted from adding too much elimination time to .19. In reality, the jury only heard testimony about a high end of .23, but the fact remains that that figure was too high. It necessarily follows that his testimony that, at the time he was arrested, appellant had the equivalent of fourteen drinks in his system was in error, since that figure was arrived at by assuming that at the time of the test appellant had been eliminating alcohol for 130 minutes. Actually, since the record does not reveal when appellant had his last drink, or whether he had eaten before or while drinking, there is no basis for any assumption concerning the time at which he reached his peak.

McDougall did say that in his extrapolation he was "looking at" all possible peak periods. In view of his statements concerning the longest time it might have been possible to appellant to peak, it is patent that he was not considering the possibility that appellant peaked after the test. His statement that all the "studies" he has read show that it takes from 30 to 90 minutes to reach a peak reveals that his reading has been somewhat selective. He missed Dubowski, *Alcohol Determination: Some Physiological and Metabolic Considerations*, in ALCOHOL AND TRAFFIC SAFETY, 91 (1963) (anywhere from 30 minutes to three hours); Gerald J. Donnellan, *Driving with 0.10% Blood Alcohol: Can the State Prove It?*, 16 U.SAN FRAN. L. REV. 817, 823 (1982), and Radlow and Hurst, *Delayed Blood Alcohol Determination in Forensic Applications*, 2 CRIM. JUST. J. 281, 283–84 (1979) (absorption may take up to 2½ hours to reach a peak).

McDougall's calculations refuse to recognize that persons who have absorption rates different from those used by an expert in his extrapolation, are necessarily in danger of having erroneously high BAC attributed to them at the time they were driving or arrested. Mason and Duboski, *Breath–Alcohol Analysis, Uses, Methods, and Some Forensic Problems–Review and Opinion*, 21 J. FORENSIC SCI. 9, 26 (note). In addition, McDougall assumed that a specific rate of elimination applied to all persons, including appellant. Studies have shown that rates of elimination may range from a low of .004 per hour to as high as .04 per hour. Frazola, DEFENDING DRINKING DRIVERS, 33 (1980). If the expert ignores this fact and opts for the application of a rate of elimination which he assumes applies to all persons, the high end of his extrapolation range is suspect. If the expert erroneously assumes, as McDougall did, that all persons absorb alcohol at the same rate and eliminate alcohol at the same rate, ignoring the actual fact of variability as to both rates, it cannot be seriously contended that the result of his extrapolation is reliable.

One desirable result, from McDougall's point of view, of his insisting that every person must peak within 30 minutes or, at the latest, 90 minutes after his last drink, is that this indefensible assumption eliminates the necessity of facing the problems concerning rate of absorption which would be faced if appellant peaked after the breath test. Of course, it is impossible to determine time of peak, since the time of appellant's last drink is unknown. But we do have the time of arrest, and use of that figure results in a determination that appellant peaked, at the earliest, 100 minutes before the test or, at the latest, 40 minutes before the test. In either case, McDougall's figures refer to a situation which,

according to his testimony, could not possibly exist. His low end is based on the assumption that appellant peaked at the time of the test, which was 130 minutes after the arrest. A diligent prosecutor would insist that appellant was not harmed by the error, since a low end based on the impossible situation that appellant peaked 130 minutes after the test would result in subtracting too high a figure from the test result of .19, which would be beneficial to appellant, since it would show a BAC at the time of arrest which was lower than what it should have been. It would also be insisted that any error on McDougall's part would affect only the credibility of his testimony, not its admissibility. Both of these arguments ignore the point which is before us. If the figures that McDougall used have no basis in fact, this would show that he has no knowledge of the scientific theory on which he supposedly relied or of the correct technique for applying that theory, as well as demonstrating that because of such ignorance, he did not correctly apply the valid technique. His error forces the conclusion that the three *Kelly* requirements of proof of valid theory, valid technique, and correct application of such valid technique, have not been satisfied. This failure of the State to meet the *Kelly* requirements must result in a finding of inadmissibility, not merely a possible reduction in the credibility of the witness. A holding that McDougall's error affects only credibility is impossible without ignoring the *Kelly* decision. Such error establishes lack of knowledge.

It is also necessary to consider, and evaluate, McDougall's defense of his calculations as being based on his "parameters" which he described as a "hypothetical" individual with "a normal drinking pattern." I have pointed out that he made no attempt to define the obviously indispensable and magic term, "normal drinking pattern." The reason for this lack of definition is not difficult to determine. There is no reliable study which determines what a "normal drinking pattern" is.

The following five paragraphs are supported by the discussion under the heading "Alcohol Consumption" in 1 ENCYCLOPEDIA BRITANNICA, 437, 443–45 (15 th ed., 1977).

The universal and general functions of drinking are displayed in a great variety of ways and customs in different countries and among various subgroups and subcultures. Whether, when, what, how much, where, or with whom a person drinks will depend not only on a person's taste, predilection, or psychological need but also on the person's age, sex, residential neighborhood, education, associations, church and other memberships and socio-economic status. In the United States, where more than 25% of adults do not drink, the better educated and economically advantaged are more likely to be drinkers than the poor, although among the poor who do drink, the proportion of heavy drinkers is higher. In France, on the other hand, abstainers are more likely to be found among the better educated and upwardly mobile.

A comparison of 25 countries based on latest available figures showing types of beverages consumed and the actual amount of alcohol from each, shows that France and Italy head the list in terms of alcohol consumption, with wine being the favorite drink in each country, with distilled spirits ranking high and beer being the least favorite. Italians favor wine also with distilled liquors ranking second and beer third. The United States ranks thirteenth in terms of total alcohol consumption but has the second highest ranking in preference for distilled spirits, and medium and low ranking, respectively for beer and wine.

Although in both France and Italy preference for wine is high, attitudes as well as patterns differ in the two countries in many ways. In neither country are there consistent patterns among regional populations and socio-economic groupings. Among the Scandinavian countries, the pattern is not one of daily drinking or drinking with meals; rather, there is

heavy drinking on weekends and special occasions. In England and Ireland beer is the favorite drink and the pub is the favored place for drinking.

Drinking patterns in the United States have been subjected to more formal examination than in other countries, but studies have mainly focused on segments of the population regarded as sources of problems, such as alcoholics, traffic offenders, criminals, inmates of mental hospitals, or youths, specially, as is true of McDougall's studies, students. The results of the systematic studies in the United States indicate that there is no pattern typical of the nation as a whole. Instead, the studies reveal a variety of patterns and customs brought over by repeated waves of immigrants from different places and of diverse ethnic stocks, modified by intermixture, economic circumstances, political circumstances, and the emergence of indigenous ways. Some conclusions are justified. On an average, men drink substantially more than women. Among adolescents, about 57% of boys and 43% of girls drink. These percentages rise with age, and it appears that persons in the 25–29 group constitute the highest proportion of drinkers. As they continue to age, more persons in this country become abstainers. Among drinkers, beer tends to be the preferred drink of men and of unskilled and blue collar workers. Distilled spirits are preferred by middle and upper class men and by women, especially in the form of mixed drinks. A good deal of drinking takes place at home, although not most commonly with meals, and on parties, especially at cocktail parties-more specifically on leaving work and before the evening meal.

In general, styles and customs of drinking are influenced by geographic and ethnic backgrounds, but Americans tend to be members of multiple small societies, and, to some extent, drinking differs within each of these societies. People from diverse origins may drink alike when bound together by some special association, as fellow collegians [the group apparently studied by McDougall], members of a business convention, members of the armed services, or guests at a special kind of social function. Even then, the expected way and amount of drinking are probably modified by an individual's background. Even within a situation where drinking-even drunkenness-is institutionalized, as on skid row, differences in patterns are observable.

In view of these circumstances, it is difficult to find that McDougall's parameter-normal drinking pattern-has any meaning at all. Clearly, he could not be referring to his knowledge of drinking patterns among the five billion people in the world. Since drinking patterns vary among different groups of this country's population, it must be concluded that there is no universal drinking pattern that can be considered as applicable to a particular person. There is no evidence supporting a finding that he was talking about a pattern in a group to which appellant might belong. The two thousand persons whose patterns he studied were only those to whom he served drinks, so that his experience was limited to his students. His studies may embody valid conclusions as to a pattern among first and second year college students, but they cannot be validly applied to everybody without reference to the presence or absence of the many factors which influence absorption and elimination. In fact, the amounts they drank did not correspond to their drinking patterns. The amount they drank, what they drank, how fast they drank, etc., was determined by the bartender, McDougall.

I realize that it would impose a heavy burden on prosecutors and, perhaps, even on forensic experts, not to mention judges who are attempting to act as gatekeepers, to insist that experts base their opinions on facts which are, at least, more likely than not to be applicable to the specific person whose condition is in question. By their very nature, "average" and "standard" rates or values do not meet this test. The rule that no person shall be convicted

of a crime except upon sufficient evidence certainly requires that the State's proof focus on the specific individual, and not on general population averages, or, worse, on rates, values, or characteristics which are selected arbitrarily and categorically assumed to be applicable to all persons. At the very least, averages or standards, or arbitrarily selected characteristics should be shown to be applicable to, at least, most of the persons or the persons in the same class as the individual whose condition or conduct may be in issue. If even such a relaxed standard of proof is not met, the evidence is irrelevant and inadmissible. In the absence of such a showing, there is no basis for holding that the theory and the technique ostensibly being relied on by the expert are reliable. In this case, there is no evidence that the averages, standards, or other rates, values, or characteristics on which the extrapolation was based, except, perhaps the "standard rate of elimination," were in fact applicable to most persons, nor, in fact, to any one member of the group whose rates, values and characteristics resulted in the determination of the average. McDougall committed egregious error by adopting Widmark's avenge Rho and making it applicable to all persons although, in fact, it was applicable to no more than 10% of the persons tested by Widmark. In the face of such showing of McDougall's willingness to apply averages to all people, in complete ignorance or, at least disregard, concerning the number of persons to whom a particular average applies, there is no basis for upholding a presumed finding by the gatekeeping judge that the other averages which McDougall applied to appellant were, in fact, rates, values or characteristics applicable to even a majority of the people of the world, or to even a majority of the class of persons to which appellant belonged.

My conclusion requires a discussion of the previous en banc decisions by this court in *Mireles v. Texas Dept. of Public Safety*, 993 S.W.2d 426 (Tex.App.—San Antonio 1999, no pet.), and *Hartman v. State, (Hartman 2)*, 2 S.W.3d 490 (Tex. App.—San Antonio 1999, pet. filed). In *Mireles*, appellant's driver's license was suspended by an administrative law judge pursuant to Tex. Transp. Code Ann. § 524.035(a)(1) (Vernon 1999), which permits such suspension on proof that the person operated a motor vehicle on a public highway at a time when his BAC was .10 or higher. Appellant sought reversal of the judgment suspending his license, arguing that there was no evidence that his BAC was in excess of .10 at the time he was driving. The San Antonio Court on rehearing, affirmed judgment of suspicion by a vote of 4–3.

The arresting officer stopped *Mireles* because he was exceeding the speed limit. The officer testified that *Mireles* smelled of alcohol (incidently, alcohol is practically odorless, and what an officer smells on the breath of a person stopped is the smell of the ingredients, besides alcohol, which are used in intoxicating beverages). The officer further testified that *Mireles* failed the field sobriety tests. About an hour after the arrest a breath test revealed a BAC of more than .10. 993 S.W.2d at 431. There was no evidence based on retrograde extrapolation.

The majority opinion held that the statute did not require extrapolation evidence, and that the test result one hour after the arrest, when considered in connection with the testimony of the arresting officer that *Mireles* smelled of alcohol and failed the field sobriety test, was sufficient to support the inference that *Mireles* had a BAC in excess when he was driving one hour before the test.

The majority opinion begins by noting that where the State relies on the per se definition of intoxication, the State's proof will "normally" appear in the form of a "chemical test showing the alcohol concentration in a person's body, near the time of the offense." 993 S.W.2d at 429. Presumably, the opinion was intended to say that the breath test only gives the alcohol con-

centration in the persons blood [not body] at the time of the test, and not at the time of the offense. As so interpreted, there is no reason to quarrel with the statement.

The majority opinion concludes that, given the result of the breath test one hour after the arrest, the inference that Mireles had a BAC in excess of .10 at the time he was driving was reasonable in view of the officer's testimony concerning the smell of alcohol and the result of the field sobriety tests.

The opinion clearly stands for the proposition that the result of the field sobriety tests is some evidence, which supports the conclusion that the later breath test correctly shows the alcohol concentration in the blood one hour before the test. In my opinion, this holding cannot stand in view of the decision of the Court of Criminal Appeals in *Emerson v. State*, 880 S.W.2d 759 (Tex.Crim.App.1994).

*Emerson* concerned the testimony of an officer who had received special training in the administration of field sobriety tests, including the test for horizontal gaze nystagmus (HGN). The National Highway Traffic Safety Administration (NHTSA), in a 1992 official publication, *Improved Sobriety Testing*, which the Court of Criminal Appeals cited with approval, said that the HGN test is the "single, most effective field sobriety test in determining whether an individual is alcohol impaired." 880 S.W.2d at 766. The NHTSA also concluded that the result of the test was reliable in showing that the person tested had a BAC in excess of .10. The Court held that the officer could testify concerning the result of the test as evidence of the fact that the driver was "alcohol-impaired," but that he could not testify that the result of the test showed a BAC in excess of .10, because he was not qualified to draw that conclusion, despite his training, and because the reliability of the test as an indicator of a BAC in excess of .10 had not been scientifically established. *Id.* at 768–69. The holding was simply that a field sobriety test was admissible because rele-

vant scientific literature described it as the most efficient roadside test in determining impairment as the result of consumption of alcohol, but that it was not admissible as evidence of the existence of a BAC in excess of .10 at the time of the offense.

Despite the Emerson holding, the *Mireles* opinion, relying on conclusions drawn by other appellate judges whose qualifications as experts are not shown and are, at the best, somewhat doubtful, concludes that the failure of a driver to perform well on the field sobriety tests, none of which has been shown to have the reliability of the HGN test as evidence of alcohol-impairment, is not only evidence of impairment, but is also some evidence of a BAC in excess of .10.

There are other reasons why *Mireles* should not be considered as controlling authority in this case. Here McDougall declared that the field sobriety tests were not reliable indications of intoxication, because the failure of a driver to perform well in those tests could be caused by many factors other than intoxication. The court in *Mireles* did not have the benefit of such testimony. Nor was the court's attention called to the fact that the Manual recognizes the lack of reliability of the field sobriety tests. (p. 5–18). McDougall did not testify in *Mireles*, as he did here, that the only evidence given by the result of the breath test was the BAC of the person tested at the time of the test, and that the result gives no clue concerning the BAC of that person at any other time.

The *Mireles* decision poses a very interesting problem. In *Hartman* 1, the Court of Criminal Appeals held that testimony by an expert witness based on retrograde extrapolation was subject to the rules announced in *Kelly* concerning expert testimony. *Hartman v. State*, 946 S.W.2d 60, 63 (Tex.Crim.App.1997).

In *Mireles*, this Court held that expert testimony was not required, and that the trier of fact could make the inference necessary to make a finding concerning the

defendant's BAC prior to the breath test. 993 S.W.2d at 429. This is, in effect, a holding that a person with no knowledge can, without reference to any scientific theory, valid technique, or correct application of the unknown valid technique, based on the breath test result, infer the defendant's previous BAC. We know that this process, although the court did not mention it, is commonly known as retrograde extrapolation. The *Mireles* majority, if, in fact, it realized what it was actually holding, ignored *Hartman* 1. A rather interesting result of the *Mireles* opinion is that expert testimony concerning retrograde extrapolation is not admissible, since, according to *Mireles*, ordinary laymen with no training can do it just as well and such testimony will not help the jury.

In view of the *Emerson* and *Hartman* 1 opinions, and the evidence in this case that the field sobriety tests are not reliable, *Mireles* is not controlling here.

*Hartman* 1 is a case in which testimony based on retrograde extrapolation was offered by McDougall, the same person who testified in the case before us. 946 S.W.2d at 61. Officer Munzy stopped defendant in San Antonio on the night of July 8, 1992, because of erratic driving and lack of taillights. *Id.* Defendant's eyes were bloodshot and "glassy," and his breath smelled strongly of alcohol. *Id.* Munzy administered four field sobriety tests (HGN, Romberg, one-leg stand, and walk and turn). *Id.* Defendant "failed" all four tests, and Munzy then arrested him for driving without a valid driver's license or liability insurance and "took him to the station at 11:55 p.m." *Id.* At 12:36 and 12:39 a.m July 9, defendant was given Intoxilyzer tests by Munzy. *Id.* Both tests revealed a BAC of .138. *Id.*

At the time of the hearing on defendant's motion to suppress the extrapolation testimony, McDougall was, as in the case before us, Bexar County's Breath Technical Supervisor and was co-author of the Manual. *Id.* Based on the BAC .138 revealed by the breath test, McDougall

testified that defendant's BAC at the time of the stop was between .110 and .15 or .16. *Id.* If McDougall based his low end of .11 on the result of the 12.36 a.m. test, he assumed that defendant was absorbing alcohol at the rate of almost .04 per hour during the 41 minutes which intervened between the stop and the test. If he based his low end on the 12:39 a.m. test, he assumed a lower rate of absorption. Since he did not declare what rate of absorption he was using, this is one possible guess concerning the rate he used. Since it is based on the actual time which expired between arrest and test, it is the most logical. Unfortunately, we cannot rely on it, because McDougall stated that the 11:55 p.m. which the officer's report shows as the time of arrest could be "rounded off" to 2400, which would give an interval of 36 minutes, instead of the actual figures of 41 and 44 minutes, the rate of absorption he used would, of course, be different. He then said he believed the low end of his range would show a BAC of "about .11" or, perhaps, "a little higher -.12 and .16."

If McDougall used the first test as the basis of his extrapolation, then his low end of .11 was based on the assumption that the defendant was absorbing during the intervening period of 36 minutes at a rate of almost .05 per hour. His other possible low end of .12 shows he assumed an absorption rate of .03 per hour.

If the high end was a BAC of .15, based on the actual elapsed time of 41 minutes, McDougall was assuming an elimination rate of less than .02 per hour. The other possible high end of .16, based on the actual time interval of 41 minutes, is based on an elimination rate at least .03 per hour. Using McDougall's chosen elapsed time of 36 minutes, the high of .15 was based on an elimination rate of almost .02 per hour, which can be considered the equivalent of his "standard" elimination rate of .02 per hour. The other possible high end of .16 is based on the assumption that, during the 36 minutes which McDougall used in his extrapolation, the defen-

dant was eliminating at the rate of more than .02 per hour.

The *Hartman* 2 record shows that McDonald's extrapolation yielded several possible ranges. These were (1) low end of .11 and high end of .15; (2) low end of .11 and high end of .16; (3) low end of .12 and high end of .15; and (4) low end of .12 and high end of .16. These ranges were calculated by using rates of absorption of .03, almost .04, and almost .05 per hour, and rates of elimination of about .02, more than .03, and in excess of .05 per hour.

In *Hartman* 2, as in the case before us, there is no evidence that McDougall had any knowledge concerning the defendant's actual absorption and elimination rates, that is, he did not know how much alcohol defendant had absorbed or eliminated in the 41 minutes between arrest and test. For that matter, he was as ignorant of these matters when he chose to base his extrapolation on an elapsed time of 36 minutes rather than the actual 41 minutes.

It should not be overlooked that in *Hartman* 2, as in the case before us, McDougall was forced to assume that whatever absorption or elimination rates he used in arriving at his various ranges applied to all persons. It may be true, as stated in the majority *Hartman* 2 opinion, that the question "is not whether all experts would reach the same numerical result as McDougall," but whether "his testimony was sufficiently relevant and reliable to aid the jury in its deliberations." But this does not mean that the expert witness can assume that all persons absorb and eliminate alcohol at the same rate when the overwhelming majority of experts on absorption and elimination of alcohol, including the Manual which McDougall co-authored, agree that this is not true. It does not mean that an expert who attempts to perform an extrapolation based on absorption and elimination, can correctly extrapolate when he is as ignorant, as McDougall confessed he was as far as Hartman was concerned, of practically all of the factors which affect absorption and elimination.

It is universally accepted that, as McDougall testified in *Hartman* 2, intake of food before or while drinking, would slow the rate of absorption. Yet, McDougall testified that if Hartman had just finished a full meal at the time of the stop, forty minutes before registering .138 on the Intoxilyzer, his BAC at the time of the stop "would most certainly be between 0.12 to 0.15." *Id.*, at 492. If the possible low ends of .11 and .12 apply without reference to whether Hartman had eaten or not, this testimony shows that McDougall's statement was based on the theory that the presence of food in the stomach speeds up absorption or has no effect on it, that is, that the low end would have been the same whether Hartman had eaten or not. This cannot be true.

McDougall's testimony in *Hartman* 2 that he could testify concerning Hartman's BAC at the time of the stop because of his training concerning the effects of alcohol on a person's ability to "safely drive a car;" his study of how much alcohol it takes to reach a given BAC "based on body weight;" and his observations of "over 2,000 going through a complete drinking cycle at classes he taught at San Antonio Junior College over the last seventeen years." These "qualifications," which the *Hartman* 2 majority described as "impeccable" deserve comment.

1. His training concerning the effects of alcohol on a person's ability to drive is beside the point. Almost everyone, without special training, knows, based on mere observation, the effects of alcohol on a person's ability to drive safely. Alcohol, if consumed in sufficient quantity, will certainly impair a person's normal mental and physical faculties to such an extent that he is unable to drive safely. This, of course, is one of the definitions of "intoxication" in the Texas statute. But the fact that person is intoxicated is no indication of that person's specific BAC anymore than the presence of HGN, while it may be an

indicator of impairment due to consumption of alcohol, is a reliable indicator of a specific BAC. The fact that not all persons suffer impairment at the same BAC is clearly recognized in the use of the generally accepted idea that some persons "hold their alcohol" better than others. Knowledge of the effect of alcohol on driving is no qualification showing an ability to perform extrapolation which requires a knowledge of absorption and elimination of alcohol. (In the case before us, McDougall testified impairment takes place when BAC is .08).

2. The study of "how much alcohol it takes to reach a given" BAC "based on body weight" has no value if the expert does not know the body weight of the person whose prior BAC is in question. McDougall's admission that he did not know Hartman's body weight makes this special training irrelevant, if in fact it is any help at all in performing extrapolation. His statement that the Intoxilyzer machine used for the breath test "already accounts for the subject's body weight" is amazing. The material in the Manual which sets forth the steps to be taken by the person performing the breath test makes no mention of body weight. The questions and signals which the machine asks do not concern body weight. The information which the operator must type in does not include body weight. The result of the test which the machine prints out does not mention body weight. There is, in fact, no reason why the machine need take body weight into account. The most obvious reason is that there is no way for the machine to "know" the body weight of the person whose breath is being tested. The machine functions by beaming light rays at a container which contains a sample of the breath of the person being tested. The light rays are blocked by the presence of alcohol, and the amount of alcohol present in the testing chamber is determined by the amount of light rays which are blocked. That is, the reported BAC depends solely on the amount of alcohol in the subject's breath and nothing else.

Therefore, the result of the test in no way depends on the weight of the person tested. The same amount of alcohol in the breath will yield the same BAC without reference to the weight of the person giving the test sample. Since the weight of the person whose breath is being tested is completely irrelevant, the machine is not "told" what the weight is, and the report of the test does not mention weight. The BAC of a particular person may depend on that person's weight, but knowing a person's BAC gives no indication of his weight.

Even if we accept McDougall's claim that the machine takes into account the irrelevant factor of the subject's weight, McDougall's ability to determine how much alcohol it takes to produce a given BAC would be completely irrelevant as an aid to extrapolation. The simple fact is that, despite the superior knowledge which he claims the machine acquired in some unknown way concerning Hartman's weight, there is no evidence that the machine transmitted this knowledge to McDougall.

3. Observation of over 2,000 students in the first and second years of college going through the complete drinking cycle from intoxication to regaining a sober condition does not qualify McDougall to perform retrograde extrapolation. He "observed" these youngsters while he was acting as bartender. At the very most, this would give him some knowledge concerning college students, and there is no evidence in the *Hartman* 2 opinion, the evidence in the *Hartman* 2 record, or in the scientific literature which justifies attributing the reaction of freshmen and sophomores to alcohol to all the people in the world. The people McDougall observed getting drunk as a result of his bartendering and watching them sober up cannot be regarded as representative of the entire population, nor even of the entire drinking population. In addition, the testimony merely shows that he observed

them. There is no evidence that he subjected them to various blood, breath, or urine tests as did, e.g., Widmark, in order to determine their rates of absorption and elimination. Further, the record does not disclose whether the students drank on empty or full stomachs, or whether they drank the same type of intoxicating liquor or an intoxicating beverage which had the same alcohol content as the beverage Hartman consumed on the night in question.

As far as his statewide teaching is concerned, the only evidence is that he taught his students how to use the Intoxilyzer. There is no evidence that such teaching required knowledge of absorption or elimination rates or of the many factors which influence such rates.

The majority opinion in *Hartman* 2 recognizes that the admissibility of the evidence in question depended on proof of a scientific theory and technique for its application which are both valid and that such valid technique was properly applied. Since the existence of a valid theory and a valid technique for its application were not before the court, the conclusion of admissibility was necessarily based on a finding that McDougall properly applied that valid technique. The majority held that he did. The only evidence in that case concerned the technique which McDougall applied which, as already mentioned, required the false assumption that all persons absorb and eliminate alcohol at a fixed assumed rate. Evidence of what McDougall did is no evidence that what he did conforms in any way to the valid technique for applying the valid scientific theory. The court's conclusion that the technique which McDougall used was a proper technique is not based on any evidence concerning the valid technique, nor on any reference to scientific literature suggesting that the valid technique assumes that a rate of absorption and rates of elimination, whatever those rates may be, are applicable to all persons, with absolutely no consideration given to the universally recognized varia-

bility of those rates and to the numerous factors which influence such rates. It is significant that the *Hartman* 2 majority opinion contains not even a suggestion of the nature of the valid technique which it says McDougall applied. Both the trial court and the San Antonio court's majority opinion simply assumed application of an identified but valid technique, much as McDougall assumed, the universal applicability of whatever rates he used.

Neither *Hartman* 2 nor *Mireles* is persuasive.

Because I do not believe that McDougall's testimony is "sufficiently relevant and reliable to help the jury in reaching accurate results" under the test announced in *Kelly,* I would hold that the trial court erred in admitting McDougall's testimony and would reverse the trial court's judgment.